The People ex rel. John H. Nichols, Respondent, *v.* The Board of County Canvassers of Onondaga County, Appellant.

The right to vote, secured to the citizen by the Constitution, must be exercised in the manner and subject to the regulations, as to time and method, lawfully prescribed by the legislature.

Where a statute, therefore, prescribes the method of voting, all of its substantial requirements must be complied with, and while *it seems*, in the absence of some clear and positive prohibition in the statute against counting ballots cast without observing the forms and regulations prescribed, the tendency of the courts is to effectuate the intent of the voter, and that the statute should be so construed as not to place an arbitrary or unreasonable obstruction in his way, where there is such a prohibition the ballots so cast are void and should not be counted.

The primary object of the "Ballot Reform Act" (Chap. 262, Laws of 1890, amended by chap. 296, Laws of 1891) is to enable the voter to cast his ballot without the possibility of revealing by the act of voting the identity or political complexion of the candidates voted for.

*It seems*, therefore, that any construction of the statute which will permit votes to be cast and counted which contain any caption or word revealing what is so sought to be kept secret, should be avoided.

The said act requires the same indorsement upon all the official ballots used at any polling place, and any ballot cast having a different indorsement and one disclosing the candidates voted for is void and may not be counted (§ 17); and this, without regard to the question as to whether the change was made with intent to render the ballot distinguishable, or as to whether the elector had knowledge or means of knowledge of the improper indorsement. (Andrews, Finch and Peckham, JJ., dissenting )

The provisions of said act (§ 29) prohibiting inspectors of election from depositing any ballot, except the unofficial ballot, provided for (§ 21), not properly indorsed or one having "a distinguishing mark on the outside thereof," and the provision of said act (§ 31) prohibiting the canvasser from counting any such ballot refer to the official ballots, not to unofficial ballots other than those provided for in the act. (Andrews, Finch and Peckham, JJ., dissenting.)

In proceedings by mandamus to compel a county board of canvassers to reject certain votes cast at a general election for P., a candidate for the office of state senator, these facts appeared: The county clerk, in compliance with said act, caused official ballots to be printed for each election district in the county, one for each of the political parties that had made nominations; all were alike indorsed, as prescribed by the

statute, with the designation of the polling place or election district for which the ballots were prepared. In transmitting these ballots to the town clerk, while those of all the parties, but the one of which P. was the candidate for senator, were properly delivered, in nine of the election districts the ballots of that party were transposed, so that those indorsed for one district were sent to another, and were there used and voted, and thus the ballots for that party in each of said districts were indorsed with the number or designation of another district and could be distinguished from those of the other parties. *Held* (ANDREWS, FINCH and PECKHAM, JJ., dissenting), that an order granting the writ prayed for was proper; that the defective ballots could not be considered as unofficial ballots, as they purported to be official ballots and the condition authorizing the use of unofficial ballots did not exist; and that said ballots could not lawfully be counted.

(Argued December 11, 1891; decided December 29, 1891.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made December 8, 1891, which affirmed an order of Special Term directing that a peremptory writ of mandamus issue to the board of county canvassers of Onondaga county to reconvene and recanvass the votes cast in said county for state senator, and to exclude from their computation the votes cast for Rufus T. Peck certain votes not properly indorsed.

The facts, so far as material, are stated in the opinions.

*William Nottingham* for appellant. Sections 1, 2, chapter 460, Laws of 1880, permitting the board of county canvassers to be reconvened under the order of the Supreme Court and compelled to correct errors in their previous determination and canvass, was not intended to enlarge the powers of the board as to the matters here in dispute, nor to enable it to take evidence or consider proof *aliunde* the returns. (*People ex rel. Deuchler* v. *Board of Canvassers*, 64 How. Pr. 336; *People ex rel. Gregg* v. *Board of Convassers*, 54 Hun, 597.) The duty of the board of canvassers was merely to estimate from the face of the returns of the inspectors of election the number of votes cast for the state officers and for state senator and to certify and file such statements with

the county clerk. (Election Code, §§ 260–288, 269–272; *People v. Cook,* 8 N. Y. 67; *Kortz v. Board of Canvassers,* 12 Abb. [N. C.] 88, 89, 91; *Felt's Case,* 11 Abb. [N. S.] 206; *People ex rel. Deuchler v. Board of Canvassers,* 64 How. Pr. 336; Bright's Leading Cases on Elections, 305; *Lewis v. Comrs. of Marshal Co.,* 16 Kan. 102, 108; *People ex rel. Noyes v. Board of Canvassers,* 126 N. Y. 392–400; *People ex rel. Stapleton v. Bell,* 119 id. 175; *Brown v. Rush Co.,* 17 Pac. Rep. 304; *State v. Wilson,* 38 N. W. Rep. 3.) The character of the ballots cast cannot be impugned or investigated in this proceeding. (*People ex rel. Noyes v. Board of Canvassers,* 126 N. Y. 392; Laws of 1842, chap. 130, tit. 5, § 15; Election Code, § 278; *People ex rel. Russel v. Board of Canvassers,* 46 Hun, 392; *People ex rel. Gaige v. Reardon,* 49 id. 425; *People ex rel. Gregg v. Board of Canvassers,* 54 id. 595.) The board of county canvassers cannot use the sample ballot attached to the returns to overrule the result. (*People ex rel. v. Pease,* 27 N. Y. 45.) The order and writ were not applied for nor granted under the Ballot Reform Act. (§ 16, chap. 296, Laws of 1891.) The votes must be counted for the candidates for whom they were honestly cast. (Cooley on Const. Lim. 758; *Monroe v. Collins,* 18 Ohio St. 665; *People ex rel. v. Bell,* 119 N. Y. 178; *Deils v. Kennedy* 23 Am. Dec. 645.) The indorsement upon the ballot complied with the law. (Laws of 1890, chap. 262, § 17; Laws of 1891, chap. 296, § 6.) The electors had the right to use these ballots. (Laws of 1890, chap. 262, §§ 20, 21; Election Code, § 671; Laws of 1891, chap. 296, §§ 8, 16; *People v. Pease,* 27 N. Y. 45.) A peremptory writ should have been denied in any view of this case. (*People ex rel. N. E. Bank v. Stupp,* 49 Hun, 544; *People v. Board of Supervisors,* 64 N. Y. 600; *People ex rel. Savings Bank v. Cromwell,* 102 id. 477; *People ex rel. McMackin v. Board of Police,* 107 id. 235.) The office in question being a legislative office, and the legislature being under the Constitution the exclusive judge of the election, returns and qualifications of its members, these votes can be excluded only upon a,

resort to that tribunal. (Const. art. 2, § 10 ; *People* v. *Hall*, 80 N. Y. 117; McCrary on Elections, 345.) The previous mandamus proceedings before Justice KENNEDY constitute an effectual bar and estoppel against the relator here. He was a party to suit in former proceeding. He acquiesced in and complied with the order and writ therein. The same questions here involved were therein raised and passed upon. (*Nemetty* v. *Naylor*, 106 N. Y. 562; *Pray* v. *Hegeman*, 98 id. 351.)

*Joseph H. Choate, William A. Sutherland, Matthew Hale, J. F. Parkhurst, Eugene Burlingame* for appellant. Presenting the same general points and authorities as in the case of the *People ex rel. Sherwood* v. *State Board of Canvassers* (*ante*, p. 360).

*Louis Marshall, O. N. Kellogg* and *David McClure* for respondents. The Republican ballots cast in the several election districts in question, which did not bear the indorsement required by section 17 of chapter 262 of the Laws of 1890, as amended by section 6 of chapter 296 of the Laws of 1891, were void, and could not, therefore, be legally counted or canvassed for the candidates whose names appeared thereon. (Chap. 262, Laws of 1890, §§ 19, 29 ; chap. 296, Laws of 1891, § 15 ; *Jackson* v. *Lewis*, 17 Johns. 475 ; *People* v. *N. Y. C. R. R. Co.*, 13 N. Y. 78 ; *Commonwealth* v. *Woelper*, 3 S. & R. 29 ; *West* v. *Ross*, 53 Mo. 350 ; Sedg. Stat. & Const. Law, 369 ; *In re Directors of Mohawk R. R. Co.*, 19 Wend. 143 ; Cooley Const. Lim. 602; *Ledbetter* v. *Hall*, 62 Mo. 422; *Ogelsby* v. *Sigman*, 58 Miss. 502; Election Code, 1880, §§ 137, 138; *Perkins* v. *Caraway*, 59 Min. 222; *Steele* v. *Calhoun*, 61 Miss. 556; *State* v. *McKinnon*, 8 Oregon, 493; *Reynolds* v. *Snow*, 67 Cal. 495; *Talcott* v. *Philbrick*, 20 Atl. Rep. 436; 59 Conn. 478; *Fields* v. *Osborn*, 21 Atl. Rep. 1070; *In re Vote Marks*, Id. 962; chap. 7, Laws of 1891.) The ballots thus improperly indorsed being void, the board of county canvassers, by counting them in violation of the provisions of the

Ballot Reform Act, made an erroneous determination which should be corrected pursuant to chapter 460 of the Laws of 1880. (*People ex rel.* v. *County Board,* 18 N. Y. S. R. 797; *Ogelsby* v. *Sigman,* 58 Miss. 502; *Hall* v. *People,* 90 N. Y. 498; *Rex* v. *Mayor,* 4 T. R. 699; *Rex* v. *Bedford,* 6 East. 356.) The writ of mandamus granted upon the relation of Rufus T. Peck against the board of county canvassers of Onondaga county is not *res judicata* as against the relator in the present case, because neither the parties nor the subject-matter in the two proceedings are the same. (*Reilly* v. *City of Albany,* 40 Hun, 405; *Case* v. *Reeve,* 14 Johns. 79; *Knauth* v. *Bassett,* 34 Barb. 31; *Bache* v. *Doscher,* 67 N. Y. 429; *Bissell* v. *Kellogg,* 65 id. 432; *Otis* v. *Williams,* 70 id. 208; *Truax* v. *Slater,* 86 id. 630; *Zink* v. *City of Buffalo,* 6 Hun, 611; *Hall* v. *Richardson,* 22 id. 444; *Fisher* v. *Banta,* 66 N. Y. 468; *People* v. *Lynch,* 68 id. 473; *Durant* v. *Abendroth,* 97 id. 132; *Bath* v. *Atrill,* 106 id. 423; *People ex rel.* v. *County Bd.,* 18 N. Y. S. R. 797.)

O'Brien, J. The Supreme Court has awarded a peremptory writ of mandamus, directed to the board of supervisors of Onondaga county as a board of county canvassers, commanding them to reject and exclude from their statement and computation of the votes cast for Rufus T. Peck, in that county, for the office of senator for the 25th senatorial district, composed of the counties of Onondaga and Cortland, at the last general election held on the third of November last, certain ballots cast in the nine election districts hereafter mentioned. This appeal is brought for the purpose of a review in this court of the order granting the writ. It was made upon the application of the relator on a state of facts, as to which there is no dispute, and the question is one of law regarding the power of the court. It appears from the record that certain ballots were cast at the election for Rufus T. Peck for the office of senator in the *first* election district of the town of Camillus upon which was the following indorsement : " Official Ballot for Second District Poll, town of Camillus,

November 3, 1891," followed by a fac simile of the signature of the county clerk of Onondaga county. In the *second* election district of that town ballots were cast for him indorsed in like manner, with the designation and number of the *first* district.

In the first district of the town of Clay ballots were cast for him indorsed for the *second* district, and in the second district indorsed for the *first*. In the first election district of the town of Tully ballots were cast for him indorsed for the *second* district, and in the second district indorsed for the *first*. In the first election district of the town of Elbridge ballots were cast for him bearing the indorsement for the *third* district. In the second election district of that town ballots were cast for him indorsed for the *first* district, and in the third election district indorsed for the *first*. In the first and second districts of Camillus and the first and second districts of Clay the same facts existed, in regard to the indorsement of the ballots for member of assembly for the first assembly district of Onondaga county. The ballots were prepared and printed by the county clerk, whose duty it was, under the statute, to deliver to the town clerk of each town the ballots for the several election districts in such town; but how they became transposed, in the manner above described, does not appear. Four different official ballots, containing the names of the candidates of the four different parties that had made nominations and filed certificates thereof, in compliance with the law, were delivered to the inspectors of election in all these districts, and were in use at the several polling places on the day of the election. What was known as the Republican official ballot, containing the names of the candidates of that party for state, county and legislative offices, was the only ballot used and voted that did not contain, in the indorsement, the proper number and designation of the polling place or election district where it was voted.

On the hearing of the relator's application at Special Term, Rufus T. Peck, upon his own application, was permitted to intervene and was made a party to the record on the ground

that he had an interest in the subject-matter of the proceeding and a right to intervene as a party defendant and that a complete determination of the questions involved could not be had without his presence on the record. In order to facilitate a speedy hearing the attorneys of record entered into a stipulation providing that the questions involved in the case be presented to and determined by the court upon the facts as they appear in the papers. In this condition of the record we are not embarrassed by any technical questions, such as the power of the county canvassers under the statute to exercise any functions of a judicial nature, but we are to meet the broader and more important question whether, upon the facts, the ballots in question can lawfully be counted for the candidate for whom they were cast. The ground upon which the canvassers were directed to exclude the ballots from their estimate and statement of the vote for senator was that they were not indorsed with the number of the election district in which they were used by the electors, as required by the statute, but were, in fact, indorsed with the number of another district. Under the laws in force governing the conduct of elections and the manner of voting, prior to the recent legislation commonly known as the Ballot Reform Act, it is quite clear that ballots could be counted for the candidate for whom they were cast, though they did not in all respects correspond with the directions of the statute, and after deposited in the box, could not, probably, be rejected in any case by the canvassers if the intention of the voter was sufficiently expressed. The right to vote, secured to the citizen by the Constitution, must be exercised in the manner and subject to the regulations lawfully prescribed by the legislature in respect to the time when and the method by which his will is expressed, and in order to make his will and intention effectual at the election, he must comply with, at least, all the substantial requirements of law.

The question now before us is whether those citizens of Onondaga county, who used the ballots, which the canvassers in this case have been ordered by the Supreme Court to reject,

have so far neglected to observe the forms and regulations prescribed by law for voting at elections, that their votes so cast, must be held to be void. In the absence of some clear and positive prohibition in the statute, against counting such ballots, the tendency of the courts would, undoubtedly, be in the direction of effectuating, as far as possible, the intent of the voter. But it is the duty of this court to declare the law as it finds it and if a fair consideration of the language used in the statute, and its general policy, should result in the exclusion of the ballots in question, it may be said that it was not the first time that a citizen attempted to exercise a right, and either through neglect, mistake or ignorance, failed in the accomplishment of his object. We are confronted with certain clear and positive statutory provisions, which must now be referred to in order to ascertain whether the court, in ordering the mandamus to issue, simply obeyed the mandate of the legislature or misapprehended its meaning. What is known as the Ballot Reform Act is chapter 262 of the Laws of 1890, as amended by chapter 296 of the Laws of 1891. It is matter of recent history that this law was for years the subject of agitation and earnest debate both in the legislature and before the people, through the public press and otherwise. No statute has been passed in recent years, at least, that received such full consideration or after so much deliberation and careful scrutiny on the part of the executive and the legislature. It was so apparent to everyone that it worked such radical changes in the conduct of elections and in the manner of voting, from the regulations previously existing, that its final passage was secured only after the most exhaustive and careful scrutiny on the part of the law makers and the public. Great care was used in the selection of language appropriate to express clearly what was intended, and every detail, both of composition and arrangement, was the subject of study and deliberation. In dealing with a statute originating as this did, we may well assume that every word or phrase was weighed and scanned, and that courts can safely follow the plain language of its provisions as the expression of the legislative intent. The gen-

eral policy and scope of the act was well expressed in the title: "An act to promote the independence of voters at public elections; enforce the secrecy of the ballot, and provide for the printing and distribution of ballots at public expense." We know that the principal mischief which the statute was intended to suppress, was the bribery of voters at elections, which had become an intolerable evil, and this was to be accomplished by so framing the law as to enable, if not compel, the voter to exercise his privilege in absolute secrecy. The primary aim and object was to enable the voter to cast a ballot for the candidates of his choice without the possibility of revealing, by the act of voting, the identity or political complexion of the candidates voted for. When it was made impossible for the briber to know how his needy neighbor voted, the law makers reasoned that bribery would cease. It is reasonable, therefore, to assume that any construction of this statute which would permit ballots to be cast and counted that would reveal the way the voter using them voted, should be avoided as contrary to the true policy and intent of the law. The idea at the very foundation of the law was secrecy. To this end, it was provided that ballots, uniform in size, in type, in color and quality of paper, and in the words and appearance of the indorsement, should be printed and distributed by the county clerk, at the public expense. This is called in the law the official ballot, and is the only instrument by means of which the elector can legally express his will at elections, save in the exceptional cases provided for in section 21. These are cases where the official ballots have not been delivered at the time provided in the statute to the town or city clerk, or shall be destroyed or stolen, after such delivery, or a candidate for any office, whose name is printed on the official ballot, shall have died, shall be or become ineligible, or shall have withdrawn before election day. In such cases, unofficial ballots, to be prepared and furnished under the conditions and restrictions prescribed in the section, may be used by the voter. It is obvious that this section has no application to this case, as none of the events provided for therein have happened.

So careful was the legislature in providing for secrecy in voting that it prohibited the voter from in any way marking his ballot or showing it to anyone, after it was prepared for voting, in such a way as to reveal its contents, and everyone was prohibited from soliciting the voter to show the same, and no person but an inspector of election is permitted to receive a ballot prepared for voting from a voter. (§ 35.) It is, moreover, expressly provided that any election officer or watcher who shall reveal to another person the name of any candidate for whom a person has voted, or who shall communicate to another his opinion, belief, or impression, as to how, or for whom, a voter has voted, or shall place a mark upon a ballot, or do any other act by which one ballot can be distinguished from another, shall be guilty of a misdemeanor, punishable by imprisonment. (§ 34.) It is also provided that a ballot, deposited by a voter in the ballot-box, upon which, or upon any paster affixed thereto, a writing or mark of any kind has been placed by the voter, or by any other person to his knowledge, with the intent that such ballot shall afterwards be identified as the one voted by him, shall be void and of no effect. Most of these stringent provisions would be little short of absurd if it can be supposed that ballots, bearing an indorsement which distinguishes them from all others in use at the polls, can be lawfully put into the ballot-box. The indorsement upon the official ballot was an essential part of the machinery of elections, by means of which the secrecy of voting was to be secured and enforced. That was to be printed in large letters and was to be uniform as to all the ballots at the same polling place. As it was the only part of the ballot to be exposed to the observation of the election officers and the bystanders, at the moment when the vote is offered, it was important to provide that it should contain nothing that could reveal to anyone the elector's choice. The indorsement was, therefore, to be precisely the same on all the ballots used at the same polling place or election district. A different, distinct or peculiar indorsement upon the ballots, or any of them, used by any party or candidate, or set of candidates, would, of course,

remove all secrecy from the act of voting, as to the electors using a ballot with such an indorsement, and thus the fundamental purpose of the law would be defeated.

This was so apparent and was regarded as of so much importance in the successful operation of the law that the legislature carefully prescribed the form of the indorsement to be used upon all ballots at the same polling place in the following language: " On the back of each ballot shall be printed in type known as great primer roman condensed capitals the indorsement ' official ballot for ——,' and after the word ' for ' shall follow the designation of the polling place for which the ballot is prepared, the date of the election and a *fac simile* of the signature of the county clerk.  The ballot shall contain no caption or other indorsement, except as in this section provided."

This provision plainly requires that upon all the official ballots used at any polling place, there shall be printed in the manner therein described, the same indorsement, and consequently that the designation or number of the election district in the indorsement shall be precisely the same and, in all cases, that designation or number shall be that of the polling place or election district where the vote is offered, and no other. The ballots in question were cast in utter disregard of this important provision of the statute, as the indorsement did not in any case contain the designation or number of the election district where they were voted, but did contain the designation or number of another district, where they were not used.  The indorsement upon them differed from the regular indorsement on all the other ballots used or voted at the same polling place, and as they were used or voted by but one of the parties that had made nominations or, in other words, in behalf of but one candidate or set of candidates, the voters who used them necessarily disclosed to the election officers, watchers and such of the bystanders as could and desired to observe, the candidates voted for, and thus not only the letter of the statute was disregarded, but its very purpose and intent defeated.

It cannot be denied that anyone who saw the indorsement

on the ballots before they were put into the box was informed at the same time as to their contents by means of the word in the indorsement designating the wrong polling-place or district. While there is nothing in the record to show that the ballots were intentionally, or by any preconcerted arrangement, diverted from the election district for which they were prepared and sent to districts for which they were not prepared nor intended, it is scarcely possible that the means of distinguishing them from all the other ballots used were not known to the election officers who received, and many of the voters who used them. But, however that may be, the important fact remains that every elector who voted one of the ballots thereby revealed his choice and the contents as fully and completely as if the party designation, or the political complexion of the candidates whose names appeared upon its face, had been made a part of the indorsement, or was stamped in some other place on the outside of the ballot. If this can be held to be a legal exercise of the right of suffrage, and that the ballots thus cast are on the same footing as all the other ballots, then it is manifest that the legislature has utterly failed to secure secrecy in voting. The legal consequences that follow this disregard of both the letter and the spirit of the statute have been, as it seems to us, very clearly pointed out by the legislature. The twenty-ninth section as amended provides that " No inspector of election shall deposit in a ballot-box, or permit any other person to deposit in a ballot-box, on election day, any ballot which is not properly indorsed and numbered, except in the cases provided for in section twenty-one of this act; nor shall any inspector of election deposit in a ballot-box, or permit any other person to deposit therein, on election day, any ballot that is torn, or has any other distinguishing mark on the outside thereof." It will scarcely be claimed that these ballots were " properly indorsed," or that they came within the provisions of section twenty-one, and, consequently, the election officers were commanded by the statute not to deposit them in the ballot-box when offered by the voter. Moreover, they had what the statute calls a " distinguishing mark on the

outside;" that is to say, they had, when placed among the other ballots at the polling places where they were used, a special and peculiar indorsement, by means of which they could readily be distinguished from all others, and thus the improper indorsement was at the same time a distinguishing mark.   It will be seen, upon a careful reading of the statute, that the legislature has carefully provided for the exclusion of marked ballots from the ballot-box and from the final count and estimate of the actual legal vote in two cases. First, where the mark or writing is affixed or placed upon the face or inside of the ballot, or upon any paster attached, by the voter or any other person, for the purpose and with the intent of subsequently identifying the ballot and tracing it to the voter.   In this case the ballot is not to be rejected or excluded from the count and estimate until the intent is ascertained and determined.   Secondly, where there is a distinguishing mark on the outside, open and visible to all, which may not only be used to identify the voter who cast it, but also serves to inform others, at the time of voting, of the contents of the ballot, and thus defeat the object of the law in securing secrecy.   In this case the election officers are forbidden to put the ballot into the box, no matter with what intent the distinguishing mark was placed upon it.   To allow it to go into the box might defeat the policy of the law, though the distinguishing mark was the result of accident or mistake. The plain words of the statute, therefore, made it the duty of the election officers, when offered one of these ballots, prepared for and indorsed with the designation or number of · another district, to refuse it.   This would not defeat the right of the elector to vote, because he could still prepare and tender a ballot with the proper indorsement.   But the inspectors did receive the ballots and put them into the ballot-box, and the remaining question is whether they could lawfully count ballots found in the box, which it was their duty to refuse when offered by the elector.   Upon this point the statute seems to be clear and imperative.   The thirty-first section provides for the canvass of the votes by the inspectors in these

terms: "The votes for the several candidates shall be canvassed in the order in which they appear upon the several ballots. No ballot that has not the printed official indorsement shall be counted except such as are voted in accordance with the provisions of section twenty-one of this act." We are unable to construe this language when applied to the facts of this case in any other way than as the clear and positive mandate of the legislature to the canvassers to reject and treat as void, all ballots found in the box, prepared for and bearing the designation and number of another and a different polling place or election district than the one where the ballot was cast. The legislature has forbidden the elector to cast such a ballot. It has prohibited the inspectors from placing it in the box and the canvassers from counting it. The case could be no stronger had it in terms declared such a ballot absolutely void for all purposes. But it is said that this result will disfranchise the electors who cast these ballots in good faith, believing that they were the proper official ballots. The answer is that when an elector attempts to express his will at an election by the use, through either design or accident, of ballots which the law declares shall not be counted, the courts have no power to help him. Had these ballots been misplaced by design or some preconcerted arrangement between the county clerk and the candidates whose names appear thereon or some of them, the voter using them might be as innocent then as they appear to be in the case at bar, but to hold, under such circumstances, that the votes must, nevertheless, be counted would be to suggest an easy method of defeating the fundamental purpose of the statute. The law contemplates that the elector will not blindly rely upon anyone, not even the election officers, in the preparation of the ballot. If he is handed an official ballot with a distinguishing mark upon it or an improper indorsement he is not obliged to vote it but may procure a proper ballot. In this case it cannot be said that the electors were obliged to use these ballots or omit to vote at all. It was their duty to see to it that so important a part of the ballot as the indorsement was in conformity with

the statute.  They must have known or, at least, could easily have ascertained, that the ballot was prepared for and indorsed with the number of another polling place and then they could have used paster ballots, containing the names of the candidates of their choice,. upon some one of the other three official ballots in the hands of the inspectors, and which all concede contained the proper indorsement, and the ballots in question could then be returned to the inspectors.  That the use of these ballots was at best a wholly unnecessary and thoughtless act on the part of the voters who cast them, is entirely evident.  But, even if it could be said that those electors had no knowledge or means of knowledge in regard to the improper indorsement, and that they could not without some inconvenience provide themselves with ballots such as the law required; we would still be obliged to hold that it would be far better that their votes should be deemed ineffectual than that the fundamental purpose of an important public statute should be subverted and, in the struggle to save these votes by judicial construction, the door should be thrown open for evasions of the statute, which might revive evils far more dangerous to the public welfare than can possibly, under any circumstances, follow the exclusion of a few hundred votes in a single county, cast by voters who, at least, as all must admit, neglected to observe important requirements of the law. It may be freely admitted that no statute, regulating the conduct of elections, should be so construed as to place arbitrary or unreasonable obstructions in the way of the citizen in the exercise of his right to vote; and, further, that any law fairly open to such an objection, would be in conflict with the Constitution.  But when we keep in mind the fact that the statute, now under consideration, was intended to prevent corruption and the consequent debasement of the franchise, it was not unreasonable to provide that if an elector attempts to exercise his right in such a way as to reveal the contents of his ballot or to make subsequent identification possible, the inspectors shall not receive it, and if received, it shall not be counted.  There is a view of the case, which was

not suggested in the argument and does not appear in the briefs of counsel, but originated with members of the court, that we have carefully considered. It is suggested that when section twenty-nine speaks of certain ballots that the inspectors are not to receive, and section thirty-one of certain ballots that the canvassers are not to count, reference is made only to unofficial ballots, other than those provided for in section twenty-one. This is not the natural and obvious meaning of the language used, and such a conclusion cannot be reached without supplying words that the legislature has not used. The ballot which the inspector must refuse, under section twenty-nine, is there described as one "which is not properly indorsed and numbered," and the ballot which the canvassers shall not count, under section thirty-one, is there described as one "that has not the printed official indorsement." So far as these two sections require inspectors to refuse votes offered, and canvassers to exclude votes found in the box, not regular by reason of neglect to comply with the statute in respect to the indorsement, they obviously refer to the same or similar defects, and apply to the ballots in question. The legislature could not and did not anticipate that any other unofficial ballots, than those provided for by section twenty-one, would be offered or could get into the box, and was not providing against such an impossible or very remote contingency. The prohibitions of these two sections were clearly aimed at evasions or abuses liable to arise in the use of the official ballots, and such as did actually arise at the election in question. As no question of this kind could possibly arise under the laws relating to elections in force prior to 1890, there are no adjudged cases by the courts to be found in this state that furnish any aid in the solution of the question before us; but enactments, similar in their provisions and identical in policy, have been before the courts of many of our sister states for construction. One of the earliest cases on the subject was that of *Commonwealth* v. *Woelper* (3 S. & R. 29). In that case the election was one for officers in a religious corporation, but the principle decided applies to public elections. What

was known in that case as the German party succeeded at the election, having cast five hundred and thirty-one ballots. The tickets voted by them were marked with the figure of an eagle. The elections were regulated by a corporate by-law which provided that "if, besides the names, there are other things on the ticket, or if two or more votes are found together, *such tickets shall not be read off or votes counted.*" The defeated party claimed that the tickets marked with the eagle ought not to have been counted, though the voters who cast them were members of the congregation entitled in all other respects to vote and to have their votes counted at elections. On a trial at *nisi prius* the jury were so instructed and the election was held invalid. On appeal this instruction was held to be correct. The court (Tilghman, Ch. J.,) said:

" The fifth and last point turns on the construction of the by-law before mentioned. The tickets in favor of those persons who succeded in the election had on them the engraving of an eagle. The judge who tried the cause charged the jury that those tickets ought not to have been counted. The case is certainly within the words of the law. The tickets had something more than the names on them. But is it within the meaning of the law? I think it is. This engraving might have several ill effects. In the first place, it might be perceived by the inspectors even when the ticket was folded. This knowledge might possibly influence him in receiving or rejecting the vote. But, in the next place, it deprived those persons who did not vote the German ticket, of that secrecy which the election by ballot was intended to secure for them. A man who gave in a ticket without an eagle was set down as an anti-German, and exposed to the animosity of that party."

In *West* v. *Ross* (53 Mo. 350), the statute provided that "no ballot not numbered shall be counted," and the question arose as to whether ballots cast for a successful candidate for county clerk, not numbered, should be excluded from the count. It was conceded that no fraud was intended by the inspectors in failing to number the ballots, but it was occasioned by an inadvertance on their part. It further appeared

that the number of ballots counted corresponded with the number of voters appearing on the poll list. The court, however, held that these votes were void. In the opinion, the court said :

"This case may be a hard case, and doubtless *is*; but the legislative enactment is clear, and although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land in order to provide for hard cases.

"In the present case, the legislature has provided and required that the ballots should be numbered, and then provides in express terms that no ballot not numbered shall be counted. Can we say that such ballots shall be counted without an attempt at judicial legislation? I think not, and it would be a misapplication of terms to say that such a statute is only directory."

In *Oglesby* v. *Sigman* (58 Miss. 502), an application was made for a mandamus to compel canvassers to reassemble and recanvass votes cast for member of congress, and to reject ballots claimed to be illegal, by reason of the fact that they contained certain marks and devices prohibited by statute. The statute provided that the ticket should not contain any "device or mark by which one ticket may be known or distinguished from another," and that a "ticket different from that herein prescribed shall not be received or counted." The court held that ballots marked in violation of the statute were void, and in the opinion, it was said : "We think the effect of section 137 of the Code of 1880 *is to* condemn as illegal, and not to be received or counted, every ballot which has on its back or face any device or mark, other than the names of persons, by which one ballot may be distinguished from another. This statute does not condemn devices or marks on the outside of a ballot merely, but clearly embraces the face of the ballot as well. That is apparent from the exception contained in it, and a device or mark on the face of the ballot is as

much within what we suppose to have been the object of this provision as one on the outside or back of it. It is apparent from the provision that its object is not only to preserve secrecy as to what ballot an elector casts, which is the leading idea of statutes in some other states, which prohibit any device or mark on a ballot folded, which betrays the secret of the voter, but also to secure absolute uniformity as to the appearance of ballots, in order that intelligence may guide the electors in their selection, and not a mere device or mark by which ignorance may be captivated. The legislature was trying to prevent multitudes from 'being voted,' and being guided by a mere device or mark by which they should distinguish the ballots they were to use in the process, without a knowledge of the names of persons for whom their ballots were being cast. Elections are a contrivance of government, which prescribes who are electors and how they may express their will, and it is a legitimate exercise of power to prescribe the description of ballot which shall be used."

It has been held upon similar grounds that a ballot printed upon colored paper in violation of a statute requiring them to be printed upon white paper, was void. (*State* v. *McKinnon,* 8 Oregon, 493.) And that a ballot was properly rejected which did not conform in length and in other minor respects to a statute prescribing the form of ballots to be used. (*Reynolds* v. *Snow,* 67 Cal. 497.)

In Connecticut, under a recent statute, in many respects similar to ours, the official ballot contains the name of the political party using it. At a municipal election, eighty-six ballots were cast containing the caption "Citizens" at their head, but were in all other respects the same as the Republican ballots, including the candidates' names. But as there was no party in the city known as the Citizens party, it was held that these ballots were void and could not be counted. In that case, the statute prescribed the form of the ballot which is to contain among other things "the name of the political party issuing the same," and then provided that "all ballots cast in violation of the foregoing provisions, or which do not con-

form to the foregoing requirements, shall be void and not counted."

The reasoning of the court by which that conclusion was reached is applicable here. (*Talcott* v. *Philbrick*, 59 Conn. 472.) Other cases could be cited which hold the principle that ballots cast by electors, not conforming to the provisions of a statute intended for the purpose of securing secrecy, and which reveal the contents, or render it capable of subsequent identification, are void by force of prohibitions in the statute against receiving and counting them in substance the same as is to be found in the statute under consideration. (*Field* v. *Osborn*, 21 Atl. Rep. 1070 ; *In re Vote Marks*, Id. 962; *Ledbetter* v. *Hall*, 62 Mo. 422; *Perkins* v. *Caraway*, 59 Miss. 222; *State* v. *Calhoun*, 61 id. 556.)

We think that these ballots cannot be counted without weakening or breaking down provisions of the statutes which, in view of its general purpose, must be regarded as vital. For these reasons, the order appealed from should be affirmed.

RUGER, Ch. J. While I concur in the opinion delivered by my associate, Judge O'BRIEN, I have thought it proper to state in my own language the line of thought which has led me to the conclusions reached by a majority of the court.

I regard this case as one of primary importance, not so much perhaps from the effect that its decision may have upon the interest of the individuals engaged in the controversy or the temporary prospects of political parties, but from the permanent influence which it will exercise upon the cause of ballot reform, which has in recent years shown itself so strong in the regard of the people, and vindicated that favor by the success which has attended the enforcement of the reform legislation of 1890 and 1891.

It cannot be disputed but that in the initiation of the movement for ballot reform there was much difference of opinion in regard to the propriety of the laws proposed, and much fear expressed in respect to their operation, and I must confess that I was among those who regarded the result as doubt-

ful and uncertain, and feared that their enforcement would be likely to impose a serious and dangerous restraint upon the exercise of the right of elective franchise by the citizen.

We have, however, now had two years of experience under these statutes, and it seems to me that many of those who originally opposed the law have become reconciled to its operations, and a great change has come over the popular mind in regard to its beneficial effects. I think that it will now be generally conceded that the influence of these laws, if fully and impartially enforced, will practically prevent bribery at elections and restrain the power of extraneous influence over the mind and conduct of the voter in the exercise of his political rights within healthy limits. Any decision, therefore, of this court which would tend to materially hamper the beneficial operation of these laws and relegate the question of ballot reform to its original position, will, I think, prove a serious misfortune to the country, and the source of great regret to every thoughtful and conscientious citizen.

I think that but few will dissent from these views or from the further proposition that any determination of the question before us which will prove an embarrassment to the cause of ballot reform should be most earnestly deprecated and avoided if the language of the statutes will permit of another result.

The issues involved in the present controversy, as presented on the argument, is the claim made on one side that these proceedings were on the part of the relator to change the political complexion of the senate of the state by forcing a candidate into an office to which he was not legally elected, and the assertion on the other that the candidate opposed to the relator, although having an apparent majority of the votes cast, secured that majority only by counting in his favor illegal ballots procured through intimidation and the exercise of unlawful influence over the minds and conduct of the voters at the polls. The question, therefore, which lies at the foundation of the controversy is who had a plurality of the legal ballots cast at the election in question, and as that question

shall be determined by this court, will depend the ultimate decision of this appeal.

The facts, having been agreed upon by the parties, are simple and undisputed. The twenty-fifth senatorial district consists of the counties of Onondaga and Cortland, and contains a voting population of about forty thousand. The canvass of votes showed that Peck, the Republican candidate for senator, received in the county of Cortland a plurality of seven hundred and seventy over Nichols, his Democratic competitor, and in Onondaga county, Nichols received a plurality of three hundred and eighty-eight over Peck, thus showing an apparent plurality for Peck of three hundred and eighty-two votes. The total vote for Nichols in Onondaga county being fifteen thousand seven hundred and fifty-nine, and for Peck, fifteen thousand three hundred and eighty-one. Among the ballots thus counted for Peck were twelve hundred and fifty-two which were, when voted, indorsed with a number which did not correspond with the number of the district in which they were cast, or with the number which was indorsed upon all other ballots cast in the same district at that election. These obviously illegal indorsements were found only upon Republican ballots, and were made upon all of the ballots cast for Peck in the several districts named. These were the first and second of the towns of Clay, Camillus and Tully, respectively, and the first, second and third of the town of Elbridge, and being, as I infer, all of the election districts in the several towns named.

These facts appeared upon the face of the returns made to the county canvassers, and these votes were allowed to Peck by that board under the only canvass permitted to be made by it pursuant to the express requirement of an order of a Special Term of the Supreme Court.

No explanation is furnished by the papers as to how the transposition of ballots occurred, nor are any facts stated from which it can be conclusively inferred that it was innocently produced. On the contrary, in my judgment there is the strongest evidence in the case tending to show that they were

designedly transposed. It is plainly inferable from the manner in which votes were required by statute to be prepared, printed and distributed by the county clerks to the several town clerks, that the transpositions occurred in the office of the county clerk. Thus he is required to prepare all ballots intended to be used in his county, to cause them to be printed, and when printed to be placed in separate packages properly marked for the respective towns and districts in which they are intended to be used, and to transmit them to the respective town clerks as early as the Saturday preceding the day of election for distribution to the inspectors. The distribution by the town clerk is required to be made of unopened packages, as they are directed, among the inspectors of the various districts in the town before the polls open on the morning of the election.

It is quite obvious, therefore, that the respective packages were put up in the county clerk's office, and addressed not only to the respective districts for which they were intended by the county clerk, but all those intended for a particular town were embraced in a single package addressed to the town clerk. These packages were all sent out duly addressed, and reached their respective intended destinations.

In the several election districts referred to, however, the inspectors of election, upon opening the packages addressed to them on the morning of election, discovered that the Republican ballots inclosed in the packages were all indorsed with an erroneous district number, while all other tickets contained in the same packages were properly indorsed.

No effort appears to have been made by the inspectors to correct this palpable violation of law, although within the limits of a small town it could apparently have been accomplished in a comparatively short period of time, by an exchange with the districts whose ballots had also been erroneously distributed. But the election was deliberately proceeded with, and the ballots cast in all of the towns and districts named were taken under circumstances which obviously exposed the polit-

ical character of every Republican vote as notoriously as though it had been openly proclaimed by a herald at the polls.

It is strenuously urged by the appellant's counsel that these transpositions were inadvertently made. This contention is obviously immaterial. But I think there is little in the circumstances to render such a claim either plausible or probable. In preparing the packages the persons superintending the operations must have selected with care and accuracy the ballots prepared for the candidates of the Democratic, Prohibition and Socialistic parties, and correctly assigned them to the proper district. They must also then have selected the Republican ballots designed for the several towns having two districts and put those prepared for the first district into the package sent to the second, and those designed for the second district into the package sent to the first district. This could only have occurred by rejecting the package properly marked, and selecting another package obviously designed for another district. This was done in six districts and involves the happening of twelve simultaneous mistakes of a similar character, to produce the alleged inadvertent transposition of votes.

The work of transposing the votes of the town of Elbridge was a more complicated transaction and required some calculation to make it successful, as there were several districts to be affected. This, however, was done by sending to the first district those ballots designed for the third, to the second those designed for the first, and to the third those prepared for the second; and thus each district secured its full complement of votes, but they were each marked so as to advertise, when cast, the contents of the ballot.

It is quite significant also that this is the only county of the state in which such mistakes occurred, and that it occurred only with the ballots of a single one of the four parties whose ballots were handled by the officers charged with the duty of making the distribution of ballots. No explanation is made by the county clerk of the manner in which this result was effected, except by the affidavit of a subordinate in his office, who testifies substantially that he superintended the distribu-

tion of the ballots in the county clerk's office, and that if any mistakes were made they were inadvertently committed, and not with any intent to evade the provisions of the Ballot Reform Law. This is the statement of a mere opinion, and can have no legal effect upon the character of the transaction, except to show by the testimony of an implicated party that he did not intend to commit a criminal offense.

Such is the only explanation offered by the officers implicated to account for the apparent perpetration of a great crime, through which one political party was in nine election districts of the county enabled to disregard the wholesome restraints of the Ballot Reform Law, and reap the advantages to be derived therefrom.

That a crime was committed by some one having in charge the distribution of the ballots for the several towns referred to, cannot be the subject of reasonable doubt. Among those officers the duty of the county clerk is the most important. He is charged with the whole duty of preparing the ballots for printing, overseeing their publication, assigning the towns and districts to which they are to be sent, and effecting their proper distribution. The importance of a strict and conscientious performance of his duties cannot be overestimated, as any mistake or carelessness on his part is sure to involve the most serious consequences to the cause of good government and the administration of its laws. It is, therefore, that all of the duties to be performed by him are most carefully and minutely defined by the law, and it is especially provided by the act that " every public officer upon whom any duty is imposed by this act who violates his said duty, *or who neglects or omits to perform the same, shall be deemed guilty of a misdemeanor,*" and subject to fine or imprisonment (§ 34, ch. 262, Laws of 1890, as amended), and any person who shall forge or falsely make the official indorsement of any ballot shall be deemed guilty of a felony (§ 32, ch. 262, Laws of 1890).

That these sections have been glaringly violated is made apparent by the conceded facts, and while the actual offender

may not now be certainly pointed out, it will be desired by every candid and law-abiding citizen that the incoming legislature may by a thorough investigation ascertain the facts and detect and expose the guilty party.

It is claimed by the appellants that the political party whose ballots were thus transposed could have had no improper motive in effecting such transposition. It would seem to be a sufficient answer to this suggestion to say that the act does not regard the motives of those who violate the law by improperly indorsing ballots, but condemns the act and prescribes the punishment for its commission, whatever may have have been the cause or motive for its perpetration. It imperatively requires that every ballot cast (with an unimportant exception) shall be of the same shape, size and color and have the same indorsement. The purpose of the act seems to require that these provisions should be held to be mandatory, and that a disregard of them upon any pretense whatever should constitute a violation of the law, and cause a forfeiture of any benefits sought to be derived from such illegal ballots. The vigorous enforcement of these penalties constitutes the principal mode by which obedience to the law was expected to be secured. But let us look further at the motives which may reasonably be supposed to have actuated the minds of the parties charged with the duty of handling these ballots, by their unlawful manipulation.

It appears from the votes cast, that Mr. Nichols received a large Republican vote in Onondaga county. The court can take judicial notice of the facts appearing in the public records of the state. They show that Onondaga is a Republican county, and for a long series of years has given a plurality of votes for that party varying from two to four thousand votes at each election. At this election, however, it gave a considerable plurality for the Democratic candidate. It is, therefore, obvious that for some weeks preceding the election there must have been evidence of a popular current which threatened a defection from that party and consequent accessions of strength to the ranks of its opponent.

What more efficient agency could have been adopted to arrest such a movement, than the publication of the fact that every person who deserted from his party in such an emergency would be watched and exposed to the various consequences which inevitably follow those who throw off their fealty to party obligations, and incur the hostility of their former political associates?  Not only were the voters exposed to their influences, but the fact that their ballots were improperly indorsed, exposed them to the approaches of vicious and corrupt partizans, who might either by bribery or intimidation seek to influence their conduct.

It is evident that if such practices are permitted under the law, the purpose of the act to shield the voter from obnoxious supervision and observation while exercising the right of elective franchise is practically defeated.  We are now brought to the crucial question presented by the situation, which is as to the disposition to be made by the canvassers, under the law, of the votes thus illegally cast.

The language of the act on this subject is plain and unambiguous, and furnishes a full and conclusive answer to the inquiry which no ingenuity can obscure or evade.  The statute says that " No inspector of election shall deposit in a ballot-box, or permit any other person to deposit in a ballot-box, on election day any ballot which is not properly indorsed and numbered, except in the cases provided for in section twenty-one of this act, nor shall any inspector of election deposit in a ballot-box, or permit any other person to deposit therein on election day any ballot that is torn or has any other distinguishing mark on the outside thereof."  (§ 29, ch. 262 of Laws of 1890, as amended by the Laws of 1891.)  And further, that " no ballot that has not the printed official indorsement *shall be counted,* except such as are voted in accordance with section twenty-one of this act."  (§ 31 of the amended act.)

No claim can be seriously made that the ballots in question were cast in accordance with section twenty-one of the act, and they, therefore, necessarily fall under the absolute and unqualified prohibition which is directed against the

receiving or counting of such ballots, imposed by the quoted provisions.

The act provides that no ballots not properly indorsed shall be received, or if received, shall be counted. This result must necessarily follow the commission of the prohibited act, whatever may have been the ignorance or intention of the voter or any other person connected with the act of voting, for the canvassing officers are imperatively directed not to receive or count the improperly indorsed ballot. No investigation is required or permitted by the inspector into the motives of the voter or those who prepared the ballots for him ; but without inquiry, upon the mere inspection of the ballot, the inspectors are required to take affirmative action rejecting it, and if for any reason that duty has been omitted at the polls, they are required to refrain thereafter from canvassing or counting such ballots.

It cannot, of course, be successfully contended that under the language of this statute any board of canvassers, before whom the facts lawfully come, and who are vested with the duty of canvassing votes had any authority in law to count these illegal ballots, and it was, therefore, practically decided in our deliberations, by a unanimous court, that unless some change was made in the language of the statute, these votes must be rejected.

Some of the members of the court are of the opinion that the statute may properly be read as though the word " unofficial " had been inserted in the quoted sentences before the word "ballot," wherever it occurs, so that the words of exclusion shall apply to unofficial ballots alone. This interpolation of a word is deemed to be justified by the alleged injustice which would otherwise be inflicted in this case by the disfranchisement of upwards of twelve hundred voters. The conclusive answer to this claim is the fact that the interpolation defeats the plainly implied intention of the law makers and destroys the sole beneficial purpose of the act. It is among the most primative rules of construction that the office of interpolation is to carry out the intention of the law makers

and facilitate the accomplishment of the object.   Any change, therefore, in the language of the statute which contravenes these principles is prohibited by the elementary rules of construction.

What was the obvious purpose of this statute? It is expressed in language that permits of no doubt as to its meaning, and is revealed not only by its title, but breathes in every line and word of its forty-six sections.   The title declares it to be " An act to promote the independence of voters at public elections, *enforce the secrecy of the ballot,* and provide for the printing and distribution of ballots at public expense."   The body of the act shows by manifold provisions that this purpose is to be accomplished only by the inviolability with which the conscience and intention of the voter is guarded while exercising the right of suffrage, from the observation and scrutiny of others.   It cannot, therefore, be reasonably claimed that it was within the purpose of the law makers to permit a voter, whether casting an official or an unofficial ballot, to reveal at the polls in any manner or on any pretense whatever the character of the ballot which he proposes to cast.

Let us, therefore, consider the effect of the suggested construction of this statute.   It plainly assumes to limit its application to unofficial ballots, and thereby to exempt from its operation all official ballots.   Ballots by the law are designated as official and unofficial, and are expressly defined by various sections of the act.   Those designated " unofficial " are described by section twenty-one of the act, and are ballots authorized to be printed by a town or city clerk only when the ballots required to be furnished by the county clerk have not been delivered, or after their delivery, have been lost or destroyed.   In case such ballots are not furnished by the town or city clerk in time, or the supply of ballots become exhausted before the polls are closed, each elector may furnish his own ballot.   These ballots, however, are required to be *without indorsement.*   All other ballots are official.   It is apparent then that the ballots in controversy were not in any sense unofficial ballots, and were not attempted

to be voted in accordance with the provisions of section twenty-one.

It is obvious that the use of unofficial ballots must be exceptional in any case, and was allowed only to guard against an improbable, yet possible, contingency, but was not intended by the law makers to play an important or even usual part in the conduct of an election. In fact, I think that it must be assumed that the occasion has never arisen in this state when the use of an unofficial ballot has been required. If it had, that fact would undoubtedly have become notorious. Is it reasonable, therefore, to suppose that the legislature intended its elaborate, carefully considered scheme of ballot reform to apply to a mere incident of an election rarely if ever liable to occur, and to leave the great evil, which dominated the entire country and infested every polling place throughout the state, to rage without regulation, restriction or control? It would amount to saying that the leading and most effective provision of the statute containing its only operative clauses should be emasculated and turned into a provision having no practical effect or operation whatever. A most unjust and mischievous construction would be thus given to the law, for it would apparently authorize the improper indorsement of official ballots, and although so marked and distinguished as to reveal their contents, would nevertheless permit them to be counted.

The law so construed leaves the candidate confessedly elected by illegal ballots, to avail himself of their aid in entrenching his position so that, if he can ever be dislodged therefrom, it can only be when the lawfully-elected candidate is, in the remote future, enabled to prove the agency whereby the illegal transposition of ballots was accomplished, and the secret intent with which it was done. An act leading to such results might, we believe, be more appropriately termed a statute to encourage the violation of the right of elective franchise, than one to protect and purify it.

A further answer to the construction contended for is found in the provision which prohibits any indorsement whatever

from being made upon unofficial ballots. Is it not, therefore, the height of absurdity to suppose that all the numerous and carefully-worded provisions, in respect to the disposition of improperly indorsed ballots, should be held to apply only to ballots which were never required by the law to be indorsed at all ?

A construction of a statute which changes its language so as to exclude the only subject upon which it can operate, and confines its provisions to one which will never probably occur, is without a parallel in the history of jurisprudence. No words can sufficiently express the surprise with which an original ballot reformer will learn that the only object sought by him in his struggle for ballot reform was the exclusion from the ballot-box of a ballot which could never get there except by an improbable accident.

A few words more upon a point to which I have already adverted — the claim that a literal construction of this act would result in the disfranchisement of many voters. Those voters are termed innocent, well-meaning and apparently unconscious instruments in the proceedings which resulted in placing in the ballot-boxes of Onondaga county upwards of twelve hundred illegal votes. Why they are thought to be entitled to these descriptive appellations, I am unable to understand. The law expressly forbids every voter from revealing to anyone in the polling-place the name of the candidate for whom he intends to vote, or to show his ballot after it has been prepared in such manner as to reveal its contents, and in case of a violation of these provisions, he is deemed guilty of a misdemeanor. (§ 35, Laws of 1890, amended 1891.)

Can a voter, who deposits a ballot revealing plainly and conspicuously the names of the candidates for whom he intends to vote, claim to be innocent of a violation of these requirements? These voters most certainly cannot be said to be ignorant of the provisions of the law under which they are exercising their franchise, for the law itself requires that they shall inform themselves of its requirements respecting the form and character of the indorsements made upon their ballots,

and refrain from using such ballots. It is elementary that every citizen is presumed to know the law. This is the settled theory of the law. How, then, can it be supposed that these voters were, either in law or fact, unconscious of the character of the ballot they were using? It was known, before the polls opened at each of these districts, that the Republican ballots were improperly indorsed, and this was presumably the subject of public discussion around the polls. Yet these voters deliberately determined (for they are not permitted to vote without deliberation) to use them, notwithstanding their non-conformity with the law. The inspectors of election were required, under serious penalties, to examine the indorsement upon each ballot as it was voted, and to determine as to its conformity with the law, and the voter was also required to see that no mark on his ballot revealed the character of its contents. How, then, can it be consistently asserted that any ballot was deposited in ignorance, either by the voter or the inspectors, of the fact that it was improperly indorsed? The voter, when preparing his ballot, had before· him three ballots properly indorsed and one improperly indorsed. Who should be responsible for the selection of the improper indorsed ballots and the consequences of a disobedience of the law but the offending voter?

But it is urged that a strict construction of the law must result in disfranchisement. This is true, but the law plainly contemplates such a result, and who can complain, except those who are opposed to any restrictions whatsoever upon the action of an elector? No advocate of the Reform Ballot Law can justly criticise a result which was in the minds of its authors when the law was drafted and enacted. They clearly contemplated this effect, and determined that the injustice which a few might suffer through ignorance, willful blindness or inattention to the requirements of the law, should not be permitted to defeat the great good to be secured to the whole people by the adoption of an effectual scheme for the purification of· elections. Can it then be seriously contended that voters may knowingly refuse obedience to the conditions imposed by the

1891.]   People ex rel. Nichols *v.* Bd. Canvassers.   427

Opinion per Gray, J.

law, and still claim that their votes shall be counted as lawful ballots? Such a result would transform the elaborate scheme adopted as a reform measure into an elaborate farce, calculated only to embarrass and hamper the citizen, without adding a line or word to the statute looking to the disqualification of illegal or fraudulent voters, or the purification of elections. It was an argument strenuously urged against the adoption of the law that its numerous provisions complicated, novel, and technical as they were, would necessarily result in the disfranchisement of voters, but the advocates of the law contended that these results were the necessary concomitant of any efficient ballot reform law, and the legislature deliberately and intentionally approved the adoption of such restrictions and disqualifications. It is now too late to discuss the wisdom or policy of the law, and it is certainly not permissible to attempt its reform by judicial legislation. Such a course would not only destroy the effect of the present law, but would render any future legislation, however phrased, subject to the same power of construction, and liable to be rendered again ineffectual through the force of judicial interpretation.

In accordance with these views, I think the orders appealed from should be affirmed, and the illegal ballots excluded from the computation of votes cast for senator.

Gray, J. In these proceedings, which have reference to the correctness of orders of the Supreme Court in directing, by a writ of mandamus, that the board of canvassers of Onondaga county correct their returns or statements, and that they exclude, in their computation of votes, those cast for Rufus T. Peck for senator, and for Patrick J. Ryan for assemblyman, in certain election districts, I propose to state, as briefly as possible, the reasons which influence my vote in affirmance of the orders below.

The question is whether certain ballots cast in the several election districts in question, which did not bear the official indorsement required by section 17 of chapter 262 of the Laws of 1890, as amended by section 6 of chapter 296 of the Laws

of 1891, commonly referred to as the Ballot Reform Law, could be legally counted and canvassed for the candidates whose names appeared thereon. The respect in which the indorsement of the ballots failed to comply with the statute was in bearing the designation of a polling place other than that where the ballots were given out and used. In every instance where this occurred, it was solely upon the ballots prepared for Republican votes. It is argued, however, and it may be conceded that the occurrence was the result of some mistake in the county clerk's office, in the arrangement or distribution of the various sets of ballots for the different polling places. These ballots, as counted by the board of canvassers, contributed to the result of a majority of votes for Republican candidates. The question, whether such ballots, so indorsed, should be counted, is one to be answered upon the law which at present regulates the preparation, casting, counting and canvassing of ballots at elections. The statutes which contain that law bear as their title these words: "An act to promote the independence of voters at public elections; enforce the secrecy of the ballots, and provide for the printing and distribution of ballots at public expense." The adoption of this law by the legislature was only after debates, prolonged over years. Its extraordinary plan, its objects and its features were subjected to the closest scrutiny and to much adverse criticism. The discussions reached beyond the legislative halls and it was only after the aims and methods of the proposed law had been debated with as much earnestness as thoroughness, and had been critically analyzed and variously changed, that it finally passed into our statute books. The plan embodied in the law was to have a uniform ballot. That essential feature was secured by provisions requiring all ballots to be prepared by a public officer, and to be exactly alike in every possible respect, externally in the official indorsement and differing internally only in the names of the candidates for office, upon the ballots prepared for the different political parties. It is perfectly evident that, by strict compliance with these provisions of the law, the contents of a ballot cast by a voter are absolutely

secret to all but himself, and thus the object of the statute is readily effected. The statute in its 29th section, provides that "No inspector of election shall deposit in a ballot-box, or permit any other person to deposit in a ballot-box, on election day, any ballot which is not properly indorsed and numbered, except in the cases provided for in section 21 of this act, etc."

The words of section 31 of the Ballot Reform Law are explicit enough to remove the possibility of misapprehension upon the subject of what shall be counted. It reads : "The votes for the several candidates shall be canvassed in the order in which they appear upon the several ballots. *No ballot that has not the printed official indorsement shall be counted*, except such as are voted in accordance with the provisions of section 21 of this act." The reference here is to unofficial ballots, which may be printed or written, where the official ballots have been lost, destroyed, are not ready, or have been exhausted; or whenever a candidate for office shall have died, or withdrawn, or shall be ineligible ; in which cases such an unofficial ballot may be used.

When later, in section 31, it is provided that "said ballots shall be counted in estimating the result," etc., but may be contested in a mandamus proceeding, in the section provided for, the ballots referred to unmistakably mean, as the context plainly shows, those which have been marked in any way for identification and, therefore, have been written upon by the inspectors of election for the purpose of raising the question of their legality. This later provision, which I have mentioned, was added in the amendment of the law in 1891, and was aimed at marked ballots. The original law prohibiting the counting of ballots not bearing the proper official indorsement was not altered or affected.

The official indorsement, so strictly required to exist, is prescribed in section 17 of the act, and by its terms each ballot's indorsement must be printed with a certain type, and shall read "official ballot for," and after the word "for" shall follow the description of the polling place for which the ballot is

prepared, the date of the election, and a *fac simile* of the signature of the county clerk. The ballot shall contain no caption nor other indorsement.

The argument that, for the lack of ballots properly indorsed as required by the law, those not properly indorsed may be voted as unofficial ballots, as provided in cases mentioned in section 21, and which I have mentioned, is not, to my mind, at all satisfactory, and I consider it an answer to say that these ballots which were used and which were the subject of consideration below, purported to be official ballots and bore an official indorsement, and that the conditions for the use of unofficial ballots did not exist. So scrupulously has this law endeavored to preserve absolute secrecy as to the ballot deposited, that it provides for the nullification of a ballot which is so marked as to be capable of identification in any way. The reading of sections 25, 34 and 35 exhibits the safeguards established about the depositing of the voter's ballot. All of the provisions of this law, when considered in connection with the purpose, as declared in its title, are indicative of the legislative intent that the independence and freedom of the voter are promoted and are best guarded through the casting of a ballot, absolutely indistinguishable in any of its features from all other ballots. Now, it is perfectly plain and it is not disputed that, by the variance in the numbering of the polling place in the official indorsement, these ballots in question were distinguishable from those ballots which were prepared for, given out and cast by the supporters of other political parties; and every ballot deposited marked, or could be identified as, a Republican vote. The argument that the official indorsement was correct, because prepared for the election district indicated by its number, and that a misdelivery to a different district does not affect the correctness of the indorsement required by statute, I consider quite unsound. A right construction of the language of the statute calls for a ballot bearing an official indorsement which designates the polling place at which the ballot is to be used, and where that is not so, both the object and the provisions of the statute may be violated and the law

rendered ineffectual for the accomplishment of its avowed purpose.

So is the argument unsound, which denies the right to compel the board of county canvassers to correct its statements of the result by estimating it without including that number of illegal ballots, which is indicated by and upon the sample ballot attached. If there is a discrepancy between the body of the paper containing the statement and the writing upon the sample ballot, as to the number of votes cast, then the figures in the body of the statement control, and that is the result of our decision in the *Noyes* case (126 N. Y. 392). But here the sample ballot exhibits the kind of ballots which the statement certifies to have been deposited to a certain number. Thus we have a case where ballots were furnished at polling places which were not, as to those intended for Republican votes, indorsed uniformly with other ballots. To count such, in estimating the results of the election, in my judgment, is against the letter and the spirit of the Ballot Reform Law. It was an error, for the correction of which, through the intervention of the Supreme Court, by mandamus proceedings, provision has adequately been made (Laws of 1880, chap. 460). The Ballot Reform Law was modelled after what was known generally as the Australian Ballot Law, and its enactment was a long step forwards in the promotion of the purity of popular elections. The difficulty in this case, if the result of a mistake, as we assume it to have been, was enabled to occur by the requirement of our law, that there shall be as many separate kinds of ballots as there are different political parties represented. Had there been but one ballot required, this occurrence would not have been possible. It may be, and I assume it to be, a hardship that the result should operate to render null so many votes, and to alter what may have been an honest expression of the popular will; but it would be an evil, in comparison with which the hardship complained of is as nothing, if a law, which the people of this state through their legislature so deliberately framed and have solemnly adopted, should be so construed as to render fraudulent evasion

possible.  In my judgment, unless this law is upheld and
given the effect intended for it, and adequately secured by
all of its provisions, then technical construction, or the
ingenuity of minds, can impair its efficacy.  This is not a
case for the court to strain after explanation, in order to
remedy an apparent hardship; when to do so simply results
in emasculating a provision of the law, the existence of which
is calculated to exclude all attempts at fraudulent or corrupt
practices at the polls.  It will not do to break down any of the
provisions of this law framed against a possible corrupt vote,
lest in so doing the way be left open for a more radical
destruction.  The people are supremely interested in protect-
ing the citizen voter against the prostitution of his char-
acter in the casting of a venal ballot.

The system, devised by the legislature to enforce the secrecy
of the ballot, seems a total failure, unless we give effect to the
provisions enacted to sustain it.  Genuine ballot reform, as the
people have chosen to have it, in this and many other states,
means the purity of the ballot, and that seems best attained
by the plan of a uniform or secret ballot.  If we destroy any
of the safeguards erected and intended to be maintained about
the voter, for his protection against improper influences and
intimidation, we at once do an act in encouragement of the
very evil sought to be prevented.  If the law provides for a
uniform ballot, to originate from an official source, and a plan
to render the vote of him who casts it absolutely indistinguish-
able, and, therefore, absolutely secret, may be construed one
way, in the case of a mistake, as here, then is it always open
to such construction; for the proof of a fraudulent intent in
the preparation and distribution of ballots to be used at a
polling place is, very obviously, difficult, if ever possible.  Nor
ought the burden of that proof, in my opinion, to be thrown
upon the candidate whom it has served to defeat.  He has the
right, as have the people generally, to rely upon a strict com-
pliance with the terms of the election law and to an election
held according to its requirements.  If the law is not to be
nullified in an indirect manner, then its material directions

must be heeded and the consequences it attaches to a disregard of its provisions must be allowed. The decisions of the courts in Missouri, Rhode Island and Connecticut, which are referred to, and which I need not quote from here, are all in accord with these views, and to the effect that it is not competent to inquire into the intent, or the consequences of a violation of, the legislative requirement as to the ballot to be cast at an election. I am for maintaining the integrity of this law and for construing it as it is written.

The orders appealed from should be affirmed.

ANDREWS, J. I dissent from the judgment in this case.

At the November election, there were cast in nine election districts, embraced within the towns of Camillus, Tully, Elbridge and Clay, in the county of Onondaga, 1,252 official ballots for Rufus T. Peck, the Republican candidate for senator in the 25th senatorial district. It is conceded that these ballots were cast by qualified electors, entitled to vote in the election districts in which they respectively voted; that the ballots were delivered to the electors by the inspectors of election of the election district in which the ballots were cast, and were voted in the usual way, and regularly deposited in the box by the inspectors without challenge or objection.

By the judgment in this case, the 1,252 votes mentioned are declared to be void, and the board of county canvassers are required to reject them in making their returns. The judgment proceeds on the sole ground that the printed indorsement on the ballots did not state the true number of the election district in which they were voted. The exact imperfection will more clearly appear by referring to a single case. The town of Camillus is divided into two election districts. In the first election district, 143 ballots were cast for Rufus T. Peck, for senator, with the printed indorsement "Official Ballot for Second District Poll, Town of Camillus, November 3, 1891," followed by a *fac simile* of the signature of the county clerk of Onondaga county. In the second election district a similar number of ballots were cast for Rufus T.

Peck, for senator, indorsed " Official Ballot for First District Poll, Town of Camillus, November 3, 1891," followed by the signature of the county clerk, as in the other case. The sub-stance of the matter is that the ballots prepared and intended to be used in the second election district of Camillus, were used in the first election district, and conversely, the ballots prepared and intended for the first election district, were used in the second district. The ballots in both districts were identical except in the number of the election district indorsed thereon. It does not appear that the fact that the ballots were indorsed with the wrong number of the election district, was discovered by the inspectors, the voters, or by-standers, or was in any way called to their attention on the day of election.

The facts in regard to the ballots cast in the other towns are the same as those in respect to the ballots in the town of Camillus.

Counting the 1,252 ballots for Rufus T. Peck, he was elected senator. Rejecting them, John A. Nichols will receive the certificate. The judgment of the court results in this: The candidate who received a minority of the votes of the qualified electors in the 25th senatorial district is declared elected, and the candidate who received a majority of such votes is deprived of his office.

The explanation of the mistake which has produced the present complication is simple. The Ballot Law imposes upon the county clerk of each county the duty, after nominations by political parties, or by the requisite number of citizens, have been made and certified, to prepare and print ballots for each election district in the county, in number twice as many of each kind as there were persons who voted or were regis-tered in the district at the last preceding election. It is also directed that on the back of each ballot shall be printed the words " Official Ballot," and also the number of the polling-district for which it was prepared, the date of the election and a *fac simile* of the signature of the county clerk.

The ballots for the county of Onondaga were prepared by the county clerk, and printed and indorsed in exact conformity

1891.]   People ex rel. Nichols v. Bd. Canvassers.   435

Dissenting opinion, per Andrews, J.

with the statute, and for each election district were printed the proper number, indorsed with the number of the election district for which they were intended. The duty of distributing the ballots so that the proper ballots shall reach the inspectors of the several election districts is placed upon the clerk of the county, and the clerks of towns and cities, each performing a separate part of the service. It is the duty of the county clerk to place the ballots of each kind in separate sealed packages, and mark on the outside of each package the polling-place for which it is intended, and the number of ballots enclosed. He is to cause these packages to be delivered to the clerks of the proper towns and cities within his county on Saturday before election, and take receipts therefor. The clerk to whom they are delivered is required to retain the packages unopened until the morning of election day, and at the opening of the polls in each election district to deliver the sealed packages to the inspectors of election of the district for which the packages are marked, and take their receipts.

By mistake or inadvertence of the county clerk of Onondaga county, or of his subordinates, the package of Republican ballots, prepared for one election district, were marked on the outside with the number of another district in the same town. For example, in the case of the town of Camillus, the ballots indorsed " First District Poll " were marked on the outside of the package, " Second District Poll," and those prepared for the second election district were wrongly marked on the outside of the package, " First District Poll."

· I have characterized the action of the county clerk, or of his subordinates, as a mistake or inadvertence. The moving papers contain, it is true, some general allegations that this misplacing of the ballots was designed, and done with a fraudulent intent. This is denied in the opposing affidavits, and there is nothing in the circumstances to justify a suspicion that the ballots were intentionally misplaced.

But it is sufficient to say that by the express written stipulation of the parties, the charge of fraud or collusion in the moving affidavits is waived. If this issue had been insisted

upon, and the fact was material, the peremptory writ could not be upheld, and the proceeding would necessarily fail, since it is settled that a peremptory mandamus cannot issue in the first instance, where a material fact is put in issue, but in that case the moving party will be put to his alternative writ, so that the other party may have an opportunity to try the issue presented.

It is said that there are nearly 200 election districts in the county of Onondaga. There were four tickets in nomination, and for 200 election districts 800 separate packages would be required.

The fault committed in the county clerk's office was not in the preparation or indorsement of the ballots, but in their distribution only.

The judgment of the court that the 1,252 ballots are void and cannot be reckoned in canvassing the vote for senator, is placed upon the clause in section 31 of the Ballot Law, which declares that " No ballot that has not the printed official indorsement shall be counted, except such as are voted in accordance with section twenty-one of this act." Section 31 regulates and defines the duties of inspectors of election in canvassing votes, and the question is whether the clause quoted applies to the votes now in controversy. In my judgment the construction placed upon this clause by the majority of the court proceeds upon a plain misconception of its meaning. It was a leading purpose of the Ballot Law to prevent the use by voters at election of unofficial ballots. The whole machinery of the statute has this object in view. The statute prescribes in great detail how nominations for office shall be made and authenticated. It does not seek to control the free action of political parties in nominating candidates for public office. Nor does it prevent any voter from voting for any person he may choose to vote for, whether he has been regularly put in nomination or not.

The statute does require, however, that in all cases except those mentioned in section 21, the voter shall use the official ballot in exercising the right of suffrage. He may vote for

any or none of the candidates whose names are on the official ballot, or substitute other names in whole or in part for those printed thereon. But when he desires to vote for persons not on the printed list, his purpose can only be made effectual through the use of the official ballot. He may write or paste upon the official ballot the name of any person for whom he desires to vote. If pasters are used, they must be used on the official ballot and not otherwise. The voter is not permitted to prepare his own ballot upon a paper other than the official ballot, except in the cases mentioned in section 21. The intent of the legislature to prevent the use of any other than official ballots is plainly apparent from the whole scheme of the Ballot Law. Bearing this in view, the meaning and application of the clause in section 31, above quoted, is very plain. In an election conducted in accordance with law, only two descriptions of ballots could lawfully get into the ballot-box, viz. : Official ballots and such unofficial ballots as are permitted in the contingencies specified in section 21.

If in canvassing the votes unofficial ballots are found, not coming within the class of unofficial ballots specified in that section, the conclusion is inevitable that they came there by fraud or mistake. It was to meet this situation that the clause in section 31 was inserted : " No ballot that has not the printed official indorsement shall be counted, except such as are voted in accordance with section twenty-one of this act." The meaning is the same as if the section read : " No unofficial ballot shall be counted, except such as are voted in accordance with section twenty-one of this act." That the 1,252 ballots in question were official ballots cannot be successfully controverted. They were prepared and printed as official ballots, indorsed as official ballots, distributed as official ballots, and voted as official ballots. No one could mistake their identity as official ballots. The most that can be said is, that as they were not the ballots designed to be used in the particular election district in which they were voted, and had on them the number of another election district, they were as to the poll where used, imperfect ballots. But this did not take

from them the character of official ballots, and this is admitted in the prevailing opinion. The 31st section only excludes the counting of ballots that have not the "printed official indorsement." Those ballots had the "printed official indorsement" of the proper officer. By mistake in distribution the ballots went to the wrong district. The statute does not put it in the power of inspectors to reject from the count ballots authenticated as official ballots, because they have been voted in another district than that for which they are prepared. There is no distinction in the character of the ballots prepared for one district from those prepared for another. The unsubstantial character of the objection to the ballots in question strikingly appears when the object of requiring the number of the election district to be printed on the ballot is considered. The law in order to secure the preparation and distribution of an adequate number of ballots, for the use of electors, requires the county clerk to prepare and print for each election district a number of ballots measured by the number of persons who voted or were registered in the district at the last preceding election. The provision that the number of the election district shall be indorsed on the ballots, was inserted as a safeguard against a mistake by the county clerk in preparing the requisite number of ballots, or in their distribution. The provision that the ballots should have indorsed thereon the number of the election district was not intended as a means of identifying them as official ballots. This was provided for by other indications which were certain and unequivocal.

The conclusion I have reached as to the construction of section 31, is reinforced by other considerations. By the Ballot Law the state assumes the duty of providing official ballots. The voter has no right to interfere either in their printing or distribution. In distributing the ballots the state through designated officials commits an error and ballots designed for one district are sent to another. By reason of this error it is held that the voter who uses the ballot furnished by the state, is deprived of the right to have his vote counted. If the construction of section 31 adopted by the majority of the court is

correct, it would deserve serious consideration whether the provision in question can stand consistently with the Constitution, which secures to every qualified voter the right of suffrage.

But passing this point, it is to be observed that under the Ballot Law the voter is practically compelled to use the official ballot furnished at the polls. The 24th section, after directing that at the opening of the polls the inspectors shall open the packages containing the ballots and place them in charge of the ballot clerks, proceeds: " The ballot clerks shall thereupon deliver to the voter, and the voter shall receive and take with him into the booth or compartment one of each kind of ballots, which shall have been furnished for use at such polling place." The 25th section declares that : " On receiving his ballots the voter shall forthwith and without leaving the inclosed space, retire alone to one of the voting booths or compartments so provided, and shall prepare his ballots." He may attach a paster ballot to the official ballot, or write thereon the name of any person for whom he desires to vote. But . whatever change he makes, must be indicated on the official ballot.

. Upon the question of legislative intent, it is conceivable that it was the intention of the legislature in enacting section 31, to place upon the voter the responsibility of ascertaining whether an official ballot delivered to him corresponds in every particular, in form, size and indorsement, with the description in the statute at the peril, in case of misjudgment, of a forfeiture of his vote. The legislature must be supposed to have known that the great majority of voters are plain men, who would not be familiar with the details of a complicated statute. They come to the polls without any vote prepared. The law obliges them to receive the ballot furnished them by the election officers, and upon that to indicate the changes desired. The misstating on the ballot of the proper number of the election district would not be likely to attract their attention, and in the case in question it was known neither to the inspectors nor the voters.

Assuming that section 31 is capable of two constructions, one preserving the right of the voter, and the other forfeiting it, can it be doubtful which construction ought to prevail? Shall the right be sacrificed, or shall the statute be construed so as to uphold and maintain the right? The question suggests its answer.

The conditions under which by section 21 the voter is authorized to use an unofficial ballot did not exist. This is insisted upon at length in the brief of the counsel for the relator. It emphasizes the helplessness of the voter, and the moral coercion under which he was placed, to use, if he voted at all, the official ballot furnished.

The point upon which the most stress is laid in the prevailing opinion is that the wrong number of the election district indorsed on the ballots afforded inspectors and by-standers a means of ascertaining how the voter voted. That the ballots were official ballots has already been shown. If they were not official ballots, then the consequence would necessarily follow that if all the ballots voted in any election district had been of the same character the whole vote would have to be rejected, irrespective of the question of identification. In the case supposed of ballots, all of which were affected with the same imperfection, there could be no identification of a particular vote. The misnumbering of the election district happened to be on the Republican ballots only. If this fact had been known, then the use by a voter of that ballot would be some indication how he voted. The uncertainty would arise from the fact that the voter might have attached a paster ballot, or written upon the ballot the names of persons other than those printed thereon. It is doubtless true that it was one of the purposes of the election law to secure more perfectly than theretofore the secrecy of the ballot. To attain this end the Ballot Law contains special provisions. By the 29th section inspectors of election are prohibited from depositing in the ballot-box " any ballot that is torn or has any other distinguishing mark on the outside thereof." The wrong number of the election district printed on those ballots, it is said, was a dis-

tinguishing mark within this prohibition, and that they ought
not for that reason to have been received or deposited in the
ballot-box by the inspectors. But they were in fact received
and deposited. If these ballots could have been treated by
the inspectors of election as marked ballots they were not so
treated, and that subject under the arrangements of the statute
has passed beyond the power of the courts to review.

Section 31 makes special provision for raising and investi-
gating the question of marked ballots. If during the canvass of
the votes, or immediately after its completion, any inspector or
watcher declares his belief that any particular ballot has been
written upon, or marked " with intent that the same may be
identified," it is made the duty of the inspectors to write
their names on the back thereof and attach it to their certifi-
cates with a specific statement of the grounds upon which its
validity is questioned. Thereafter and within thirty days
after the filing of a certificate declaring the result of the
election, the matter may be inquired into by a writ of man-
damus, issued out of the Supreme Court, against the board of
canvassers or officers, " by whom the ballots were counted,"
and the section then provides for the trial and determination
of the question of their validity.

The 1,252 ballots in question were not challenged as marked
ballots, were not returned as marked ballots, and they were
burned by the inspectors after the completion of the canvass
on the night of election. The present proceeding is not taken,
and could not have been taken, under the provisions of section
31, relating to marked ballots, and this is admitted by the
counsel for the relator. The whole question comes back to
the one point, of the meaning of the clause in section 31,
which declares that " No ballot that has not the printed official
indorsement shall be counted, except such as are voted in
accordance with the provisions of section twenty-one of this
act." The conclusion of the majority of the court as to the
construction of this clause is sought to be strengthened by
reference to section 29, which provides that " No inspector
shall deposit in a ballot-box, or permit any other person to

deposit in a ballot box, on election day, any ballot which is not properly indorsed and numbered, except in the cases provided in section twenty-one of this act, nor shall any inspector of election deposit in a ballot-box, or permit any other person to deposit therein, on election day, any ballot that is torn or has any other distinguishing mark on the outside thereof." It is said that the ballots in question were not properly indorsed, and that the inspectors should have refused to receive or deposit them, and that they come within the description of ballots which the statute in section 31 declares "shall not be counted." This argument leads to most incongruous and absurd results. It will be noticed that the prohibition in section 29, against depositing certain ballots, applies to ballots not properly indorsed, and also to marked ballots. But if marked ballots are received and deposited in the box, they are nevertheless to be counted. The declaration is (§ 31): "Such ballots shall be counted in estimating the result of an election." The court, under section 31, may pass upon the validity of such ballots, in a judicial proceeding authorized by the section. But the court, on such inquiry, cannot hold them invalid, unless it finds as a matter of fact that the mark was placed on the ballot by the voter or by any other person to his knowledge, "with intent that such ballot shall afterwards be identified as the one voted by him." But by the construction placed by the majority of the court on the clause in section 31 first quoted, if official ballots, not indorsed in exact conformity with the statute, are found in the box, they are to be rejected peremptorily, although the ballots were furnished by the public officials and were voted without knowledge of any imperfection therein and without any intent to violate the statute. It may be safely assumed that the legislature never intended to make such a distinction between the two cases.

Cases have been cited from the courts of other states, holding that where election laws prescribe that ballots of a certain description shall not be counted, the statute must be followed. In the view I take of the meaning of our statute, these

decisions are irrelevant to the discussion. The statute, does not prohibit the counting of the ballots in question. The mistake in the number of the election district indorsed on the ballots may to limited extent have enabled bystanders to judge how the elector voted. But this was the result of an accidental and unforeseen error in the distribution of the ballots, for which the elector was in no way responsible. To reject these votes on the ground that the policy of a secret ballot was thereby invaded, is subordinating the right of suffrage to an unanticipated incident, not contemplated or provided for by the legislature. It does not mitigate the injustice of the judgment in this case to say that it is the majority of votes, as ascertained in the manner provided by law, by which elections are to be determined. This rule, which no one disputes, does not absolve courts from the duty to seek a construction of the statute which will prevent a forfeiture of the highest political right possessed by the citizen under the Constitution, when, as in this case, he has been guilty of no wrong, and the fault was committed by the officers of the state. This decision disregards the rule, hoary with age, that penal provisions in statutes are to be strictly construed against the state and in favor of the citizen. Statutes in derogation of liberty or property are subject alike to the operation of this benignant principle. Is it less important to protect the right of the citizen in the exercise of the suffrage ?

This decision defeats the will of the majority and subverts, in the particular case, the foundation principle of republican government, and this upon a narrow, technical, harsh and unnecessary construction of the law. In place of protecting the right of suffrage, it destroys it. It takes hold of an unforeseen and accidental incident and builds upon that a forfeiture by inference and construction.

It opens the way for frauds upon the suffrage, wide reaching in their effects. In 1884, the electoral vote of this state was cast by electors who received a plurality of votes less than the number rejected by this decision. Corrupt officials can,

with reasonable safety, tamper with the distribution of ballots and allege mistake, which it will be hard to disprove.

Having a firm conviction that this judgment is wrong, I cannot do otherwise than record my dissent.

Peckham, J. (dissenting). I dissent from the conclusions arrived at by the majority of my brethren in this case, but do not desire to express my views at any great length. The question, though, is of so much public importance that it seems incumbent upon me to give some of the reasons which compel my dissent.

The facts are undisputed. Mr. Rufus T. Peck received more votes than any other candidate for senator in the 25th senatorial district, and a plurality of three hundred and eighty votes over the next highest candidate for that office. By the judgment of this court this plurality is stricken out, and one of eight hundred and seventy is given to the relator. The ballots of twelve hundred and fifty-two electors of that senatorial district, which were deposited on the day of election for Mr. Peck, without the slightest objection in any of the election districts, are to be cast aside in one mass. The reason alleged is that a mistake was made in the distribution of the Republican official ballots, by which those bearing the indorsement of one election district were sent to another election district in the same town, and *vice versa*, so that, for instance, the indorsement on the ballots actually voted in the first election district of the town of Camillus bore the number of the second election district in the same town, while those for the second bore that of the first. The indorsement complied in all respects with the law, unless this error made the ballot worthless and rendered it the duty of the inspectors of election to refuse to permit it to be deposited in the box, or, if deposited, to be counted. The ballots were voted in fact without any objection or challenge in a single instance by any human being, and were counted by the inspectors of election without a protest from any source. No one then supposed they were illegal or unofficial ballots. The county canvassers are now, by the judg-

ment of this court, to be directed to disregard every one of them, and the result will be to reverse the action of the electors in that senatorial district so far as this court can do it, and to cause a certificate of election to issue to one who in fact never was elected by a plurality of votes.

It is not claimed that any but qualified voters voted at the election in this senatorial district, and it was conducted quietly, honestly and fairly, so far as these papers disclose, without a thought of the danger impending over such election by a slight mistake in the distribution of these ballots in regard to the commission of which not one of the men who voted them, so far as appears by the record, was in the least degree responsible. The mere statement of the proposition to reverse the result of an election under such circumstances and for such a cause is calculated to create in most minds a feeling that, if actually consummated, gross injustice would thereby be done and that no fair reading of any Ballot Law would permit its consummation. To utterly disfranchise hundreds of innocent legal voters because the employe or messenger of some public officer made a mistake like the one in question, seems to me to work a burlesque on the Ballot Act and its construction.

Where any particular construction which is given to an act leads to gross injustice or absurdity, it may generally be said that there is fault in the construction and that such an end was never intended or suspected by the framers of the act. A construction of the kind placed upon the act here under discussion certainly tends to bring the law itself into contempt. This I think is a misfortune, for I believe the purpose of the act to be most commendable, and if it received a reasonable interpretation its operation would be beneficent.

The construction of this act by the majority of the court is as I believe wholly unnecessary, and (I say it with great respect) unreasonable. As to the proper meaning to be given these particular sections of the Ballot Act, I concur substantially in the views expressed by ANDREWS, J. The general object and purpose of the act may be learned from its title, being to "Promote the independence of voters at public elec-

tions, enforce the secrecy of the ballot and provide for the printing and distribution of ballots at public expense."

To these ends official ballots are to be provided by a public officer with whom the names of all parties nominated for office are to be filed, and this officer is to see to the printing of such ballots. For the purpose of identifying the ballots as official, they are to be printed in a uniform way upon the same kind of paper and on the back of each ballot is to be printed in prescribed type the words " Official ballot for ——," and after the word "for" shall follow the designation of the polling place for which the ballot is prepared, the date of the election and a *fac simile* of the signature of the county clerk, and there is to be no caption or indorsement upon the ballot other than as above. These official ballots are to be distributed by the county clerk to the town and city clerks and by them on the day of election to the various election polls in the town and city. If they are not furnished, then under the provisions of the act unofficial ballots may be used. If the official ballots are furnished they alone can be used and no unofficial ballot can be deposited in the box or counted by the inspectors.

It seems to me plain that official ballots were furnished the various election districts in question here, and that they did not cease to be such official ballots because of the mistake described. The argument for the respondent is that these ballots were "not properly indorsed," and hence should not be received or counted within section 29. That section does not, in my judgment, embrace such a case. The ballot was "properly indorsed" when printed, for it had on nothing but the words and figures provided for by statute ; it had been printed at the public expense by the proper public officer, or under his direction ; it had on the back of the ballot a *fac simile* of the signature of the county clerk, and it had been sent out for distribution according to the provisions of the statute, and had been brought to the polls by or under the direction of the town clerks respectively. Hence, when they were thus delivered, they still bore the characteristics of the official ballot, and were such ballots. The statute means that when official ballots are thus

provided, no unofficial ballot can be cast, and if cast, shall not be counted.    These official ballots did not become unofficial by the accident.    It is said that if this be the correct interpretation of the act, then a way has been found by which to positively identify the kind of ballot each voter casts and the law is in this way rendered wholly nugatory.    This, however, is not, I think, the inevitable result.    In the first place, we are bound to assume that public officers will, as an usual thing, honestly perform their official duties.    Government could not be carried on were we to proceed on the assumption that every public officer is a criminal in disguise, and ready at the first opportunity to cheat, steal or otherwise violate the law.    Some reliance must necessarily be placed on average official integrity and intelligence. It would be highly improbable that any official would intentionally and corruptly perform the act which forms the mistake in this case.    It would be a crime on the part of such official, and one of so highly hazardous a nature that few men who had been elected to responsible public offices could be found to run the risk of punishment, especially when the purpose to be subserved would be, in most cases, of so purely impersonal a nature.    The officer also acts under the responsibility of his official oath and with a knowledge that a willful violation of the statute subjects him to the danger of conviction for a felony.

But if all these safeguards are insufficient, not alone to prevent a mistake, but are even insufficient to prevent a willful violation of the act, when the object is to so mark an otherwise official ballot that it may be known whenever such ballot is voted, yet the act in such case provides for the proper proceeding.    Under section 31, an inspector of election or watcher, during the canvass or immediately thereafter, may declare his belief that any ballot has been written upon, *or marked in any way*, with the intent that it may be identified, and then the inspectors are to write their names on it and it must be attached to the original certificate, and go to the county canvassers, where a means is provided for ascertaining the facts judicially.    But the ballots are in the meantime counted.

The only possible ground for giving any importance to the

mistake in the distribution of ballots which occurred here is that as a result of the mistake every voter who voted one of these ballots was known and he was known by reason of this distinguishing mark on his ballot. Those who voted these ballots might very well have had the opportunity of placing pasters inside them and have in fact voted in a way opposite to that in which the outside of their ballots indicated and in this way the mark on the ballot would not necessarily show the way in which the elector voted.

However, the mark on the ballot in this case was important for this purpose or it was important for nothing. It was only important as a marked ballot, by which it might be determined what kind of a ballot an elector voted.

The consequence of voting a marked ballot is provided for under the section (31) above spoken of. And if it were marked pursuant to any scheme of the officials who were concerned in its distribution, such fact could be made to appear upon the judicial investigation. But a mere inadvertent mistake of an officer ought not to work such an extreme penalty as disfranchisement on innocent electors. There is no reason or justification, as it seems to me, to be found in the object or purpose of this act for throwing out ballots voted as were these ballots.

There is another view in which the act may be considered. The directions not to count the ballots or permit them to be deposited in the box are given to the inspectors of election alone. If they violate the provisions of the act they lay themselves open to prosecution criminally. If they do count ballots which they ought not to and so return a result which includes their counting, the board of county canvassers must canvass them, for such board is only a ministerial body and simply foots up the aggregate result of the whole vote and declares the same. The state board is of the same nature.

In this case the court compels the board of county canvassers to throw out votes actually received and counted by the inspectors without challenge or protest, and thus a different result is arrived at than the facts warrant. This the board

has no right to do. It should be left for judicial inquiry, where facts and motives may be dealt with.

I have read this statute with all the care and attention I could bestow upon 'it with a desire to construe it in the light of its declared purposes and with an earnest wish to effect and carry them out, but I am utterly unable to see how this can be done by the construction put upon it by a majority of my brethren. On the contrary, it seems plain to me that those purposes are endangered if not frustrated by a construction which in my judgment is unreasonable and unnecessary and by which thousands of perfectly innocent electors may annually be disfranchised without fault on their part, and the will of the majority be thus set at naught.

For these reasons I am compelled to dissent from the judgment directed by the court in this case.

RUGER, Ch. J., EARL, GRAY and O'BRIEN, JJ., concur for affirmance.

ANDREWS, FINCH and PECKHAM, JJ., dissent.

Orders affirmed.