PEOPLE ex rel. SHAFER v. MOODY.

(Supreme Court, Special Term, Otsego County. May, 1897.)

ELECTIONS—BALLOTS—INDICATING PERSONS VOTED FOR.
  The provision of the election law that voters shall indicate the candidates voted for by an X mark at a designated place on the ballots is mandatory, and failure to comply with it vitiates a ballot, without regard to the intent of the voter.

Proceeding in the nature of a quo warranto by Albert Shafer against Augustus C. Moody. Complaint dismissed.

George M. Bristol, for relator.
J. Lee Tucker and A. R. Gibbs, for defendant.

LYON, J. This is an action in the nature of a quo warranto, brought in the name of the attorney general, to oust the defendant from the office of trustee of the Second ward of the village of Oneonta, in the county of Otsego, and to adjudge the relator, Albert Shafer, entitled thereto, upon the ground that the defendant has

wrongfully entered into and unlawfully withholds the said office from the relator. The defendant is in possession of the office, under the claim that he was duly elected thereto at the annual village election held on the 9th day of March, 1896. The defendant was the candidate for said office upon the Republican ticket, and the relator the candidate therefor upon the Independent ticket. After the closing of the polls of the election, the votes were canvassed, and the defendant declared duly elected to said office over the relator, by a majority of 27 votes out of a total of 1,313 votes cast at said election for trustee of the Second ward; and the inspectors of election, in arriving at such result, threw out and refused to count 84 ballots, among which were 41 ballots marked with an "X" in the space in the Independent column, underneath the device and above the words "Independent Ticket," which space corresponded to that in which the circle in the Republican column was located. Many of the 84 ballots should unquestionably have been rejected by the inspectors in canvassing the votes, and it is conceded that the result of the election must turn upon the validity of the 41 ballots above mentioned, the invalidity of which would be fatal to the contention of the relator, and the counting of which would result in the election of the relator over the defendant by a majority of 14 votes. The relator urges that although the manner of voting did not, as to the 41 ballots, follow the statute strictly, yet that the intent of the electors to vote for each candidate upon the Independent ticket was plainly manifested by the marks upon the ballots, and that effect should be given to such intent, and that the errors should be held to be mere technical errors, and that these 41 ballots should not have been rejected; while the defendant claims that the provisions of the statutes relating to the marking of ballots is mandatory, and that an elector, in preparing his ballot, must strictly follow such provisions, otherwise his vote cannot be counted.

The statutes in force at the time of the village election in March, 1896, provided for the making of party nominations by a party convention or duly-authorized committee thereof, and also for the making of independent nominations by a given number of the qualified voters of the village, and also provided that, upon the ticket at the head of a party column, there should be printed a blank circular space, three-quarters of an inch in diameter, below the device, and above the name of the party at the head of the ticket, in which the elector who desired to vote for each and every candidate thereon might do so by making a "cross (X) mark" within such circular space, and that the ballot should be so arranged that Independent columns should be placed at the right of the last column of party nominations, and that at the head of the column in which were printed any such Independent nominations should be placed a device representing the Independent body making the nomination, "but in which column for Independent nominations the circle heretofore provided for in this section shall be omitted." The statute then in force further provided that, if an elector desired to vote a straight ticket,—that is, for every candidate of one party,—he should either make an "X" mark in such circular space, or make an "X" mark on the left of and opposite the name

of each and every candidate of such party in the blank space provided therefor; and that, if the elector desired to vote for an individual candidate, he should make an "X" mark in such space before his name. The statute also provided that the foregoing directions, in substance, should be printed upon each ballot at the head thereof, as well as the statement that "any mark or erasure made on this ballot, except as above indicated, makes this ballot void, and it cannot be counted." The statute also expressly provided that it should not be lawful to make any mark upon the official ballot other than the "X" mark, as provided by statute. It will thus be seen that the statutes in force at the time of the village election provided that there should be no circle above the names of the candidates in the Independent column, and that the only method of voting for such Independent candidates should be by making a "cross (X) mark" in the space at the left of and opposite the name of each Independent candidate upon the Independent ticket; and the single question here presented is whether the placing of such "X" mark upon these 41 ballots above the Independent column, instead of at the left of and opposite the name of each candidate in the Independent column, as required by statute, rendered these ballots void.

A brief consideration of the ballot reform law, and of the objects for which it was enacted, will serve to aid in determining this question. The title of the act as originally passed was "An act to promote the independence of voters at public elections, enforce the secrecy of the ballot, and provide for the piinting and distribution of ballots at public expense." The passage of the act, as has repeatedly been stated by the courts, was mainly for the purpose of remedying an alarming and widespread evil, to wit, the intimidation and corruption of voters at public elections, by providing a system by which there should be absolute uniformity both in the ballots and in the manner in which the elector should indicate his choice of candidates. Prior to the passage of the act, the furnishing of ballots for public elections had been in the hands of the various political parties, and the ballots so furnished by each party generally differed from those furnished by the other political parties, in size, or in shade of color, or in thickness, or in printing, although perhaps slightly, but usually sufficiently to enable the election officer receiving the ballot to distinguish how the elector voted. The lawmakers recognized the fact that if it were put out of the power of every person, other than the elector himself, to know how the elector voted, bribery and intimidation of voters must necessarily cease. Having in view the vital necessity of providing for absolute secrecy in voting, the right of political parties to furnish the ballots was taken away, and such right placed in the hands of public officials. The legislature further formulated a system of voting providing with minutest detail as to the ballot, and as to the manner of voting, having in view throughout all its legislation that the supreme object to be attained was the perfecting of methods relating to elections which would render it absolutely impossible to determine from the appearance of any particular ballot the identity of the voter casting it, or otherwise ascertain how any elector voted.

As evidence of the legislative intent to provide a system which beyond question would insure uniformity of ballots and secrecy in voting, we have but to look at the statutes themselves in force at the time of this election, with their provisions that ballots at the same polling place shall be "of precisely the same size, arrangement, quality, and tint of paper, and kind of type"; that the black ink in which the ballots are printed shall be of precisely the same tint, so that, when the stub has been detached therefrom, it shall be impossible to distinguish any one of the ballots from the other ballots of the same sort, and the names of all candidates for the same office shall be printed in type of the same size and character, even specifying that the paper shall be No. 2 book paper, the name of the office printed in brevier lower case, the name of the candidate in brevier capital letters, and the heading of the ticket in display; that each party ticket shall be separated by a broad solid line, at least one-eighth of an inch wide, and the edge of the ballot on either side trimmed off up to the border of the solid line; that the space following each name shall be at least one-fifth of an inch wide; that a heavy line shall be printed just above the names of the candidates; that a circle shall be printed just above such heavy line, and shall be defined by a heavier line; that the circular space shall be three-fourths of an inch in diameter; that the mark made by the voter shall be a "cross (X) mark"; that the pencil to be used must be one having black lead; that the space about the name of each candidate shall be defined by ruled lines, with a dark oblong space on its left, inclosed in heavy dark lines; and that the ballot shall be so printed as to give each elector an equal opportunity to designate by a "cross (X) mark" in the blank inclosed space on the left, and before the name of each candidate, his choice of particular candidates. The statutes contained many other minute provisions regarding the form of the ballot, specifying even the manner in which the ballot must be folded, and even going so far, in the effort to enforce secrecy in voting, as to make it a criminal offense, punishable by imprisonment for from six months to one year, for an election officer or watcher to reveal to any person the name of any candidate for whom a voter has voted, or to even communicate to another person his opinion, belief, or impression as to how or for whom any voter voted, or to do any act by which a ballot can be identified, or during the progress of the election to unfold a ballot which a voter has prepared for voting. The statute also makes it a misdemeanor, punishable by fine or imprisonment, or both fine and imprisonment, for any person to enter a voting booth with any voter, or to remain in a voting booth while it is occupied by any voter, or to even open the door of a voting booth when the same is occupied by a voter, with the intent to watch such voter while engaged in the preparation of his ballot, except as authorized by the election law; or for any voter to permit any person to be in the voting booth with him while engaged in the preparation of his ballot, except as authorized by the election law, without openly protesting against and asking that such person be ejected; or for any person to show his ballot after it has been prepared for voting, so as to reveal

the contents; or to solicit a voter to show his ballot, or to mark a ballot, or to do any act with the intent that the ballot may thereafter be identified as the one voted by any particular person. The election law also prohibited any person from divulging within the polling place the name of any candidate for whom he himself intended to vote or had voted, and any person who had assisted a voter in the preparation of his ballot from directly or indirectly revealing to any person the name of any candidate voted for by any voter, or the ticket which any voter had voted, and from revealing anything which might have occurred within the voting booth, under the penalty, for a violation of these provisions of the statute, of punishment by imprisonment in a state's prison for from two to ten years.

But sufficient of the provisions of the "Ballot Reform Law" and of the Penal Code, relating to crimes against the elective franchise, have already been referred to, to show with what care and minuteness the legislature made provision for insuring absolute uniformity in the ballots, and rendering it impossible to determine from any ballot the identity of the voter, and thus insuring absolute secrecy in voting, and with what severe penalties it visited any infraction of its provisions or the committing of any act which might tend to identify any ballot, or to make known the manner in which any elector voted. Having thus in view the primary and supreme object of the legislature in the enactment of the election laws, it would seem that the failure to observe any provision of the act by which it might be rendered possible to determine by the ballot the identity of any voter must, of necessity, be held not to be technical, but vital, and that the provision requiring the electors to make the "X" mark at a particular place upon the ballot must be held not directory merely, but mandatory. If, in face of the positive provision of the statute in force at the time of this election, requiring electors voting the Independent ticket to make the "X" mark at the left of and opposite the name of each and every candidate upon such ticket for whom they desired to vote, the elector could disregard this provision, and make the "X" mark not only entirely outside this voting space, and above the name of the candidate, but even above the name of the ticket, and have his vote counted, it might be urged that an elector might also make the mark at the right of or below the name of the candidate, or that the elector voting a straight party ticket might make the "X" mark just outside the circle, or with a pencil differing a trifle from black, and have his vote counted. Had there been but one of these 41 ballots cast, and the announcement been made by the person casting it that he had voted by placing the "X" mark upon his ballot above the words "Independent Ticket," instead of below such words, and at the left of and opposite the name of the candidate, as required by statute, and as had been done as to all the other ballots cast, would there have been any difficulty in selecting such ballot from among the whole 1,300 ballots cast at such election, and hence of determining absolutely from the ballot itself the identity of the person casting it? Unquestionably not, and the fact that forty-one such ballots were cast, instead of a single one, cannot change the legal

aspect of the matter. But it will plainly be seen that these or any variations which would make it possible from the ballot to identify the voter casting it would defeat the very purpose of the law, framed with such care, and expressed in language so exact, and brought to its present state of perfection only after years of earnest consideration by the legislature, the public press, and the people, and as the courts ·have said would make the law a farce.

Neither can the fact that the electors casting these ballots intended to comply with the requirements of the statute in the preparation of their ballots, and intended to vote for all the candidates named upon the Independent ticket, entitle the ballots to be counted for such candidates. The law does not make the question as to the legality of the ballot depend upon the intent of the voter, nor accept ignorance of the law as an excuse for noncompliance with its provisions.

It has been suggested that had the Independent ticket been shown the same consideration as the party ticket, and the voting circle placed in the Independent column, the marks upon these 41 ballots, being in the place in the Independent column corresponding to the location of the circle in the party ·column, would have entitled the 41 votes to be counted. While it is difficult to see any good reason why the voting circle should not have been permitted upon the Independent ticket as well as upon the party ticket, as was later done, yet it is a sufficient answer to the proposition to say that at the time of this village election the statute had made no provision for placing such voting circle upon that ticket, but, to the contrary, had expressly provided that in the column for Independent nominations the circle should be omitted.

The effect of disallowing these 41 ballots has been, as to such election, to disfranchise the electors casting such ballots. Yet it must be admitted that the plain directions of the statute as to the preparation of the ballot were not impossible of comprehension, as these 41 ballots constituted but 7 per cent. of the total vote cast for the Independent ticket, or, in other words, an average of 93 out of every 100 electors who voted for the trustee named upon the Independent ticket,—voted without making the mistake made by the electors who cast the 41 ballots; although, of the additional 43 rejected ballots, 12 were similarly marked, in addition to the other marks upon them.

Although the effect of upholding the rejection of these 41 ballots may be to disfranchise the electors casting them, yet, as was said by Judge Gray in the case of People v. Board of Canvassers, 129 N. Y. 395, 29 N. E. 327:

"It will not do to break down any of the provisions of this law framed against a possible corrupt vote, lest, in so doing, the way be left open for a more radical destruction. The people are supremely interested in protecting the citizen voter against the prostitution of his character in the casting of a venal ballot. The system devised by the legislature to enforce the secrecy of the ballot seems a total failure, unless we give effect to the provisions enacted to sustain it. Genuine ballot reform, as the people have chosen to have it, in this and many other states, means the purity of the ballot; and that seems best attained by the plan of a uniform or secret ballot. If we destroy any of the safeguards erected and intended to be maintained about the voter for his protection against improper influences and intimidation, we at once do an act in encouragement of the very evil sought to be prevented."

And as is said in West v. Ross, 53 Mo. 350:

"This case may be a hard case, and doubtless is; but the legislative enactment is clear; and, although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land, in order to provide for hard cases."

And as was said by Judge O'Brien in the prevailing opinion of the court of appeals in People v. Board of Canvassers, supra:

"When we keep in mind the fact that the statute now under consideration was intended to prevent corruption and the consequent debasement of the franchise, it was not unreasonable to provide that if an elector attempts to exercise his right in such a way as to reveal the contents of his ballot, or make subsequent identification possible, the inspectors shall not receive it, and, if received, it shall not be counted. We would still be obliged to hold that it would be far better that their votes should be deemed ineffectual than that the fundamental purpose of an important public statute should be subverted, and, in the struggle to save those votes by judicial construction, the door should be thrown open for evasions of the statute, which might revive evils far more dangerous to the public welfare than can possibly, under any circumstances, follow the exclusion of  *  *  *  the votes cast by voters who  *  *  *  neglected to observe important requirements of the law."

While the court has approached the consideration of this case with the desire to give effect as far as possible to the probable intent of the electors casting these 41 ballots, and to disregard any errors which may properly be considered technical errors, yet the court has not the right nor the power to do violence to the plain intent and provisions of this important statute. The law in existence at the time of this election provided that, in voting the Independent ticket, it should not be lawful to make any mark upon the official ballot other than the cross (X) mark at the left of and opposite the name of the candidate voted for, and that any mark made on the ballot except as so provided should make the ballot void, and it could not be counted; and the court must give force to the plain language of the statute, and dismiss the complaint herein, with costs, as demanded in the answer.